HOWARD GAULT COMPANY, Barrett-Fisher Company, E.C. Reinauer & Sons, Inc., Griffin and Brand Sales Agency, Inc., T.J. Power and Company, Tri-Frye Brand, La Mantia-Cullum-Collier and Company of Dimmitt, Deck Produce Company, Dimco Industries, Inc., Smith Potato, Inc., Barrett Produce Company, Colville and Wilson, Inc., H & S Produce Company, Walker Brothers Produce Company, Inc., Boozer Produce Company, High Plains Vegetable Growers and Shippers Council, Inc., and Texas Citrus and Vegetable Growers and Shippers, Inc., Counter-Defendants,

v.

TEXAS RURAL LEGAL AID, INC., Texas Farm Workers Union, Edward J. Tuddenham, Inez Flores, Jesus Moya and S.T. Rendon, Counter-Plaintiffs.

TEXAS FARM WORKERS UNION, Texas Rural Legal Aid, Inez Flores, and Delia Gamez Prince, Plaintiffs,

v.

Travis McPHERSON, Colonel James B. Adams, the Texas Department of Public Safety, Roland Saul, Jerry Smith, Don Davis, Granvill Martin, Charles Tue, Bobby Henderson and Jim Mattox, Attorney General of the State of Texas, Defendants.

Civ. A. Nos. CA–2–80–127, CA–2–80–129.

United States District Court,
N.D. Texas,
Amarillo Division.

Aug. 7, 1985.

918

920

Edward B. Cloutman, III, Mullinax, Wells, Baab & Cloutman, Dallas, Tex., for Texas Rural Legal Aid.

William H. Beardall and Edward J. Tuddenham, Texas Rural Legal Aid, Hereford, Tex., for Texas Farm Workers Union, Moya, and Prince.

William O. Goodman, Asst. Atty. Gen., Austin, Tex., for State of Tex.

A.B. Hankins, Gibson, Ochsner & Adkins, Amarillo, Tex., for Howard Gault Co., et al.

## TABLE OF CONTENTS

I. Introduction ...............................921
II. Jurisdiction ...............................922
III. Factual Background........................922
 A. June 24, 1980—The Picketing Begins....922
 B. Texas Rural Legal Aid ................923
 C. Deaf Smith County Sheriff Travis McPherson ................................. 923
 1. During the Strike.................... 923
 2. Outside the Strike Period .......... 924
 D. The Temporary Restraining Order...... 926
IV. Procedural History of the Litigation ........928
 A. No. 2–80–127: The TRO and the Counterclaim for Violation of Civil Rights .... 928
 B. No. 2–80–129: Constitutionality of the Texas Picketing Statutes ................. 929
 C. The Consolidated Actions ............... 930
V. Moya's Claims .............................930
 A. § 1983 .................................930
 1. Color of State Law .................930
 2. Deprivation of Rights ..............933
 (a) 1st Amendment, Substantive.....933
 (b) 1st Amendment, Procedural .....935
 (c) 6th Amendment................936
 (d) Legal Services Corporation Act..936
 (e) Malicious Prosecution ..........938
 B. § 1985 .................................938
VI. Immunity...................................939
VII. Damages ..................................940
VIII. Recovery Against the TRO Bond ............941
 A. Liability...............................941
 B. Damages..............................942
IX. Historical Background to the Constitutional Challenges in No. 2–80–129: Of *Medrano v. Allee* ....................................942
X. Standing....................................944
XI. The Merits of the Constitutional Challenges..945
 A. Article 5154d, § 1(1)....................945
 B. Article 5154d, § 1(2)....................947
 C. Article 5154d, § 2 .....................947
 D. Article 5154d, § 3 .....................950
 E. Article 5154f ..........................953
 F. Article 5154g, § 2 .....................954
XII. Summary of Holdings.......................957

## OPINION OF THE COURT

MARY LOU ROBINSON, District Judge.

## I. Introduction

In the summer of 1980, the Texas Farm Workers Union ("TFWU") attempted to organize onion harvest and packing shed workers in the Hereford, Deaf Smith County, Texas area. The TFWU picketed the onion fields and packing sheds of several growers.

Seventeen growers, packers, and trade associations, determined to stop the picketing activities, filed suit in state district court against the union, its organizers and its attorneys. They alleged multiple violations of Texas picketing statutes and obtained an *ex parte* temporary restraining order which allegedly devastated the union's organizing efforts. The state suit was removed to federal court (No. 2–80–127), civil rights counterclaims filed, and an original action seeking declaratory and injunctive relief regarding the constitutionality of the picketing statutes was also filed (No. 2–80–129). The growers, packers, and trade associations eventually voluntarily dismissed their claims, leaving only the civ-

il rights counterclaims and the constitutional challenges to be tried.

The consolidated actions were tried to the Court. This Opinion constitutes the Court's Findings of Fact and Conclusions of Law. It first discusses, at some length, the factual context of the onion field strike and then considers, in turn, the civil rights claims and the constitutional challenges to the Texas picketing statutes.

## II. Jurisdiction

This Court has jurisdiction over No. 2-80-127 and No. 2-80-129 under 28 U.S.C. §§ 1331 and 1343(a).

## III. Factual Background

Onions in the Hereford area are harvested for 6-8 weeks each year beginning in mid- to late-June. A tractor with a blade lifts the onions out of the ground and leaves them lying on the surface. Fieldworkers then clip the tops and bottoms and sack the onions for curing in the field. If onions are left lying in the sun for more than a day or two, they scald and become worthless.

In June of 1980, Jesus Moya ("Moya") a paid farm worker organizer for the TFWU, began organizing onion field and packing shed workers around Hereford, Texas. Moya had been a union organizer since 1978 and had participated in TFWU organizing campaigns in the lower Rio Grande Valley.

The TFWU arrived in Hereford knowing that a harvest season strike would threaten area onion growers with rotting onions in the fields and large monetary losses. The TFWU hoped the growers would agree to the workers' demands for higher wages and better working conditions, such as drinking water and toilets in the fields.

Preparation for the 1980 organizational campaign had begun many months earlier. Moya himself had made several trips to the area in an effort to familiarize himself with the people and the surrounding farms.

At trial, Moya stated that the primary objectives of his 1980 organizational efforts in Hereford were to obtain representation for migrant workers by the TFWU and to obtain higher wages for farm workers in the area. To achieve these objectives, Moya planned to use the following methods: (1) picket lines, marches, demonstrations, protests, hunger strikes, and strikes at the points of production, i.e., the onion fields; (2) education of workers about their basic legal rights concerning minimum wages and farm labor contractors; and (3) organization of a class of farm workers to lobby for workers' compensation, collective bargaining rights, pesticide control laws, and other civil rights legislation.

In Moya's words, "[w]e explain to them that the growers get rich by stealing the labor of the workers. We explain to them that one of the main reasons as to why they are suffering such misery is because of the thirst for profits by these growers."

### A. June 24, 1980—The Picketing Begins

In the early morning hours of June 24, 1980, Moya, Roy Hernandez and Delia Gamez Prince—two other TFWU organizers—set up the first picket line at a Howard Gault Company ("Gault") onion field. The day before, Moya had spoken with several workers from the Gault fields and they had told him that the harvest had begun. Moya selected Gault because he had heard that the field workers were not being paid the minimum wage—then $3.10 per hour—and that they had no drinking water or toilet facilities in the fields. Moya instructed his volunteers to man a picket line on June 24, 1980, early in the morning, alongside the public road close to the field being harvested.

With his picket line in place, Moya instructed his volunteers to talk to the workers as they arrived for work in the field and to hand out leaflets.

The picketers remained on the public road that paralleled the field. They did not attempt to block the field's entrances, nor did they attempt physically to prevent workers from entering the field to work.

The picket line that day was successful. Few workers went into the Gault field. Many workers joined the picket line border-

ing the Gault onion field. Activity along the picket line was generally peaceful. The workers carried flags or signs, and discussed their demands among themselves.

The picketing at the Gault onion field continued for the rest of that week. Support for Moya's efforts to organize the workers grew at a rapid pace. Pickets were eventually set up at the Griffin & Brand fields as well as various packing sheds in the area.

Neither Moya nor his supporters on the picket line entered the fields to talk to workers. Instead, they shouted to the workers or used a loudspeaker. They urged the workers to come out of the fields and shouted *"huelga"*—strike—and "come join us, companeros. Come and join us, fellow brothers, so that we can win." Although some picketers also reviled and denounced the workers who remained in the fields, no threats were made against either the growers or the workers remaining in the fields. There was no violence along the picket lines.

The ranks of picketers swelled to over 200 workers at times between June 24 and 30, 1980. When pickets were established at the Griffin & Brand fields and other Gault onion fields, nearly all of the workers left the fields. At least one negotiation occurred in which Gault agreed to raise the wage per bushel basket of onions harvested from 45 cents to 60 cents, to provide drinking water, and to put toilets in the fields.

The Meat Cutters Union, LULAC, the GI Forum, and churches in Houston, Austin and San Antonio were providing money and assistance. Five days into the strike, Antonio Orendein, the director of the TFWU, and Martha Owen, a paralegal with the TFWU Law Project, arrived in Hereford to direct an expansion of the strike into surrounding counties.

### B. Texas Rural Legal Aid

Texas Rural Legal Aid, Inc., ("TRLA"), is a federally funded legal aid organization with an office in Hereford.

Before 1980, it had represented the TFWU in actions relating to TFWU organizing activities in the lower Rio Grande Valley. It also represented numerous field and packing shed workers in the Hereford area in minimum wage and farm labor contractor claims against growers, such as Gault, and packing shed operators, such as Griffin & Brand.

TRLA attorneys Edward Tuddenham, Bill Beardall, and Inez Flores were at the picket lines on numerous occasions to render legal advice. If legal questions arose, the workers were able to ask an attorney from TRLA for advice.

The TFWU wanted TRLA at the picket lines to advise workers that they could file lawsuits for minimum wage violations and to mediate between the workers and the police or growers should the need arise. The TFWU also used TRLA attorneys to advise them concerning the trespass laws.

### C. Deaf Smith County Sheriff Travis McPherson

#### 1. During the Strike

Travis McPherson was the Sheriff of Deaf Smith County during this period of time. When the picketing began, Sheriff McPherson sent several deputies to the Gault field to investigate reports that children were running across the road and that there might be some violence relating to the picketing activity. No children were ever reported as having been injured, nor did the deputies ever report violence on the picket lines.

Sheriff McPherson had had "intelligence reports" from the Valley that there might be an onion field strike in Deaf Smith County, as had the growers. Before any picketing activity by the TFWU, Sheriff McPherson advised his deputies that the TFWU was coming and that his deputies would have to go out to the fields to help keep the peace.

Sheriff McPherson himself viewed much of the picketing activity at the Gault onion field and saw no violence, no blocking of ingress to or egress from the fields, and no commission of any otherwise unlawful acts.

No arrests were ever made for picketing activities. Delia Gamez was arrested, later in the summer, for trespassing after entering a Gault onion field to speak with a worker about a wage claim.

Sheriff McPherson considered it unwise to escalate matters by arresting participants or making a show of force, so long as the picketing remained, for the most part, lawful in nature. Nonetheless, he felt "there was some possibility of some very dangerous, terroristic-type activities going on." He believed that the TFWU, TRLA, and Moya were conspiring to disrupt the onion harvest and that the TFWU organizers were "outside agitators, communists and terrorists."

Sheriff McPherson and his deputies began videotaping the picketers to record any incident of lawbreaking. McPherson himself parked across the street from the TRLA offices in Hereford and began videotaping persons entering and leaving. He also recorded the license plate numbers of the cars parked outside TRLA's offices and ran makes to determine how many were from the Valley. The Sheriff's department used both its own videotape equipment and some supplied by the growers. After the equipment broke down, McPherson instructed his deputies to continue pointing the camera at the picketers, apparently for deterrent effect. By the time of this trial, all of the videotapes had been lost and were unavailable for viewing.

Several picketers testified that the videotapes served to inhibit their activities and created a fear of blacklisting among workers familiar with a similar videotaping incident in the Valley.

## 2. Outside the Strike Period

Neither Moya, the TFWU, nor TRLA have been well received in Hereford. TRLA's minimum wage, farm labor contractor and employment discrimination lawsuits have created a bitter animosity from citizens outraged that their federal tax dollars are being used to finance lawsuits against them.

One of the TFWU's and TRLA's most outspoken critics is Sheriff McPherson. He has spoken openly and candidly of his opposition to the TFWU and TRLA's presence in Hereford.

In mid-February of 1981, Sheriff McPherson attended a conference of the Hi-Plains Vegetable Growers and Shippers Council which was attended by many of the growers and packers in the Deaf Smith County area. He spoke on problems relating to picketing and striking by field laborers:

MR. FISHER: Travis, if you would. Incidently, this is informal. If anybody has a question at anytime, just holler. Interrupt.

MR. MCPHERSON: Well, needless to say, these people are not my greatest fans. I'll tell you. To tell you a little bit about the things that we run into and the things that we're going to do in the future, we fully intend to take every measure to try to prevent any disruption of the production of the crops.

These people are outsiders and they have no business in our area and I'm not going to cater to them. I think I've made that clear to them time and time again, but however, they still come back.

We're going to treat this just as they do in a terrorist situation. They're operating in the same manner. They're using the same techniques and all and we're going to use counter-intelligence, we're going to use dogs and we're going to use television. This seems to be a thing that really helps us.

Now, they've got people running around with them from El Salvador, the Socialist Alliance and a number of others.

Now, you know, these people are involved in communism. Moya, he goes around preaching communism all the time. The same Cuban Doctrine.

Now, you know, we can't ignore this type of thing. We either hang together or we're going to hang separate. So, you know, I fully intend to try to do my job. And I fully intend to try to keep these people where they belong.

Jesus Moya is down at the Capital now and he's down there trying to do his little thing. This guy is not dumb, by any means. But I don't think he's the biggest problem. I fully agree with Wes. I think that the Texas Rural Legal Aid is the problem because they're supplying these people with the information and they're telling them all about the Federal laws and everything.

And, you know, it's causing you some real serious problems. It's going to continue until we stop the type of abuse as we have with Texas Rural Legal Aid. The only way we're going to stop it is get ahold of our congressman, our senators and get their money stopped.

And I'm going to do everything I can. I hope you do, too. But we've got to work hard on this. And we're going to do it. Bill Sarpalius is our new senator from this area and he's head of some the agricultural ... I think chairman of some of the committees or something down there and working on some laws to put more teeth into our trespass laws and this will help us a great deal.

But one thing about it is, for God's sakes, don't do anything. Don't take it upon yourself to commit any violence or anything. You should leave it up to your law enforcement because we know what we can do. We've been trained in it. We know exactly how far to go. We know what to look for.

The people in this area, we have some new sheriffs around us and all and we're going to have regular meetings. We're going to have meetings with the growers and the shippers. We're going to have meetings with the people out in the fields and, in fact, I've already been contacted by these people and they say they don't want Jesus Moya back up here.

So, you know, we're going to do everything we can in this area and if you want to grow onions, you grow them. Because they're not going to bother you in this area or in my county, anyway.

So that about sums up my comments. I tell you, I think it's just a terrible injustice when our tax money is being used against us. But this is what's happening with Texas Rural Legal Aid. And I don't think this is the American way.

Thank you.

In April of 1981, another meeting was held, attended by city and county officials from Deaf Smith and Castro Counties, as well as law enforcement officials, businessmen and farmers from the Hereford area, and a representative from the Foundation For Law In Society ("FFLS"). A local news report indicated that none of the meeting's participants knew about it until personally contacted by Sheriff McPherson the day before. The topic of discussion was TRLA's operations in Hereford.

Travis McPherson had invited the president of the FFLS, Lewis Ingram, to visit with various community leaders concerning TRLA's operation in Hereford. Ingram told the group of ways to force TRLA to leave Hereford. News reports of the meeting indicate that Ingram told those present that the best way to force TRLA to leave Hereford was to apply political pressure to have their funds halted on the national level. Ingram advised local citizens to treat TRLA as their enemy. He advised local merchants, for example, to band together in refusing to sell goods to any TRLA lawyer or their family and to have law enforcement officials use any means necessary and available to harass them.

Animosity toward the TFWU and TRLA's activities is further exhibited in a 1979 song which was written by a Deaf Smith County Deputy Sheriff. The song, entitled "The Ballad of Deaf Smith County," praises the virtues of Sheriff McPherson and criticizes the efforts of TRLA. It was written and recorded in the Hereford area by Phil Sciumbata and the "Singin' Sheriffs", as a voice-over to the Battle Hymn of the Republic:

Glory, glory, hallelujah.
Glory, glory, hallelujah.
Glory, glory, hallelujah.
His truth goes marching on.

In the Panhandle of Texas, which you all know well,
There sets two thousand square miles of county which is a living hell.
It's called Deaf Smith. An odd sort of a name.
But listen to my story and I'll try to explain.
And of the people there and the problems they share.
Some are good, some are bad and some don't care.
Travis McPherson is the Sheriff of this land.
He's fair and he's honest. A mountain of a man.
He's a friend of those who respect the law.
For truth and justice, he's a walkin' tall.
One day out of nowhere, like a storm they came.
A group of so-called attorneys trying to make a name.
They said, listen here, Sheriff, we are going to explain.
An illegal alien and a U.S. citizen are one and the same.
We're going to raise hell and we're going to sue.
And we're going to do anything to get the best of you.
And when it's all over, well, we're going to run.
'Cause stirring up trouble is our way of fun.
Ol' Travis stood tall and said with a grin,
You carpetbaggers are not going to win.
I aim for justice and the American way.
So get out of Hereford, TRLA.
The Anglo, the Blacks, the Mexican, too,
They're all my people, so to hell with you.
Illegal aliens will get the jobs of the people I serve.
They'll take over our country which they don't deserve.
This is America. Don't give it away.
For me and my people, well, we're here to stay.

I remember the meeting at the town hall square.
A handful of people with grudges to bear.
They came face to face with the law that night.
They said, we defy your law, and we've got the right.
I sat and I watched as the tension grew.
A lawman spoke, as he was asked to do.
A voice cried out, "lawmen lie.
To live by your law, I'd rather die."
The room grew still, the silence broke,
The Sheriff stood up and in a soft voice, he spoke.
I aim for justice and the American way.
So get out of Hereford, TRLA.
The Anglo, the Blacks, the Mexicans, too.
They're all my people, so to hell with you.
Illegal aliens will get the jobs of the people I serve.
They'll take over our country which they don't even deserve.
This is America. Don't give it away.
For me and my people, well, we're here to stay.

A local radio station in Hereford refused to air the song because they felt it was "inflammatory and would serve no purpose." They did, however, receive telephone requests to broadcast the song. A radio station in Dimmitt, Texas, twenty miles south of Hereford, broadcasted the song. The Dimmitt radio station can be heard in Hereford.

### D. The Temporary Restraining Order

Late in the evening of Thursday, June 26, 1980, Roland Saul, Deaf Smith County Criminal District Attorney, and Gerald ("Jerry") Smith, one of his assistants, were having dinner at a local country club after the return of a jury verdict. Saul and Smith had spent the first few days of the strike trying back-to-back felony cases. While they were eating, Wes Fisher, a local grower and packer, approached and asked if there was anything that could be done about the strikers. This overture lead to a series of meetings and telephone calls with growers, packers and trade associations

over the next few days as Jerry Smith and the law firm of Saul, Smith & Davis, prepared a lawsuit designed to break the strike.

On Monday, June 30, 1980, the Howard Gault Company, the Griffin & Brand Sales Agency, and 15 other growers, packers and/or trade associations (the "growers"), filed suit in the 222nd Judicial District Court in Hereford, Deaf Smith County, against TRLA; the TFWU; Edward Tuddenham and Inez Flores, TRLA attorneys who had been at the picket lines; Moya and S.T. Rendon. Many of the state court plaintiffs had been neither picketed nor struck, but joined in the lawsuit as a sort of preemptive strike and a show of solidarity.

The suit alleged that numerous violations of the Texas picketing statutes had been committed and that the defendants had entered into a conspiracy to trespass on the growers' property, to block entrances to the onion fields, to use obscene and defamatory language against the growers and their employees, and to engage in mass picketing in violation of Texas law. The growers also alleged that TRLA, a regulated grantee under the Legal Services Corporation Act, 42 U.S.C. § 2996 et seq. (1982), through its employees, had violated the provisions of the Act by improperly spending federal money to support, advocate and encourage organizing activities by the TFWU and others.

At 1:30 p.m., on the 30th, State District Judge David Wesley Gulley issued an *ex parte* temporary restraining order which restrained the state court defendants as follows:

(a) From placing or causing to be placed more than two (2) pickets at any time within either fifty (50) feet of any entrance to any premises being picketed, or within fifty (50) feet of any other picket or pickets.

(b) From placing or causing to be placed pickets which constitute or form any character of obstacle to the free ingress and egress from any entrance to any premises being picketed or to any other premises either by obstruction [sic] said free ingress or egress by their persons, or by-and-through their agents, servants, and employees, or by the placing of vehicles or other physical obstructions.

(c) From acting, singly, or in concert with others, by use of insulting, threatening or obscene language, to interfere with, hinder, construct or intimidate, another in the exercise of his lawful vocation, or from freely entering or leaving any premises.

(d) From singly, or in concert with others, engaging in picketing or any form of picketing activities, where any part of such picketing is accompanied by slander, liable [sic], or the public display or publication of oral or written misrepresentations.

(e) From acting singly, or in concert with others, establishing, calling, participating in, aiding or abetting a secondary picketing.

(f) From acting singly, or in concert with others, establishing, calling, participating in, aiding or abetting secondary boycott.

(g) From, acting singly, or in concert with others, establishing, calling, maintaining, participating in, aiding or abetting any strike or picketing, an object of which is to urge, compel, force or coerce any employer to recognize or bargain with, or any employee or group of employees to join or select as their representative, any labor union or labor organization which is not in fact the representative of a majority of the employees of an employer or, if the employer operates two (2) or more separate and distinct places of business, is not in fact the representative of a majority of such employees at the place or places of business subject to such strike or picketing.

TRLA was additionally restrained:

(a) From engaging in any public demonstration, picketing, boycott, or strike or encouraging others to engage in any public demonstration, picketing, boycott, or strike.

(b) From engaging in or encouraging others to engage in any other illegal activity.

A hearing on the growers' motion for a temporary injunction was set for 9:00 a.m., on July 10, 1980. The growers posted a bond of $10,000 and had sheriff's deputies serve the TRO.

Jerry Smith had been at the courthouse trying to see the judge and obtain the TRO since early morning. Judge Gulley had several changes made in the TRO before he signed it. No notice was given to TRLA, even though their offices are only a stone's throw from the courthouse in Hereford.

The strike was devastated. Almost immediately picketers began returning to work and fieldworkers ceased coming out of the fields to join the strike. Many feared arrest. The TRLA attorneys at the picket lines were replaced with Martha Owen, the TFWU Law Project paralegal. Those on the picket line were afraid to use the same strident language they had used in the past. The number of workers picketing dropped from near 200 to 20–30. The picketers used a tape measure to keep the 50-foot spacing under the watchful eye of the Sheriff's videotaping.

Moya's reputation with TFWU executives was damaged because they questioned his capacity to organize a peaceful strike. The workers' confidence in him was shaken.

Nevertheless, TFWU's organizing activities continued throughout the onion harvest season with some success. In Moya's words, "the intensity of our success was diminished."

### IV. Procedural History of the Litigation

#### A. No. 2–80–127: The TRO and The Counterclaim for Violation of Civil Rights

On June 30, 1980, TRLA filed its petition for removal and the case was removed to this Court.

On July 1, 1980, TRLA, on behalf of all of the state court defendants, filed its Motion to Dissolve or Modify Temporary Restraining Order. In their motion, they contended, inter alia, that the ex parte granting of the temporary restraining order by Judge Gulley was improper because there was nothing to indicate that the growers made any effort to contact the defendants to allow them an opportunity to be heard, that the TRO placed unconstitutional burdens upon defendants' First Amendment rights, that the statutory basis of part of the order had been declared unconstitutional by a federal district court in the Southern District of Texas, and that the growers had failed to establish the necessity for a TRO.

On July 3, 1980, this Court modified the temporary restraining order to delete the language pertaining to the placing of more than two pickets at any time within either fifty feet of any entrance to any premises being picketed, or within fifty feet of any other picket.

On July 8, 1980, the growers moved to extend the temporary restraining order, which was due to expire on July 10, 1980, at 9:00 a.m. On July 9, 1980, the state court defendants moved to dissolve the temporary restraining order. Since the action had already been removed to this Court and the presiding judge of this Court was on vacation, the motions were heard in the Lubbock Division of the Northern District of Texas, the Honorable Halbert O. Woodward, presiding.

Judge Woodward denied the defendants' motion to dissolve the temporary restraining order because it expired by its own terms on July 10, 1980. He declined to make any finding or ruling regarding the growers' allegation that Tuddenham, a TRLA attorney, violated the provisions of 42 U.S.C. § 2996e(b)(5) (1982), stating that the testimony failed to justify the issuance of any further injunctive relief on this point.

He found that the growers failed to meet their burden under the Norris-LaGuardia Act, 29 U.S.C. §§ 107 & 108 (1982) (pertaining to the issuance of injunctions in labor disputes by United States Courts), and de-

nied their request for an extension of the temporary restraining order.

Judge Woodward found that "the evidence presented at the evidentiary hearing will not support any finding and does not establish that any unlawful acts will be committed in the future, unless restrained."

On July 21, 1980, TRLA filed its answer. The TFWU and Moya filed a separate answer and counterclaim the same day. The TFWU and Moya claimed that they were entitled to relief under 42 U.S.C. §§ 1983, 1985(2) & 1985(3) (1982) for deprivation of rights secured to them by the Constitution and laws of the United States. They sought $150,000 in actual and punitive damages, as well as injunctive relief.

On March 9, 1983, the growers moved to dismiss this case in its entirety, including TFWU's and Moya's counterclaim. In their motion, the growers allege that "[t]he suit has, in effect, been abandoned for the reason that it has become moot. The picketing ended in the Summer of 1980. There was no picketing in 1981 or 1982, nor at any time following about August 1, 1980." The growers stated that they did not desire to pursue any further injunctive relief. Defendants opposed any dismissal as to their counterclaim.

On May 12, 1983, the Court dismissed the growers' action against TRLA, the TFWU, and Moya, and ordered that the case proceed as to TFWU's and Moya's counterclaim.

On June 2, 1983, the growers filed an amended pleading in No. 2–80–127 in which they stated that they no longer sought to prosecute their cause of action against TRLA, the TFWU, and Moya, and formally responded to the counterclaim asserted by the TFWU and Moya.

### B. No. 2–80–129: Constitutionality of the Texas Picketing Statutes

On July 1, 1980, the TFWU and TRLA filed a class action complaint in which they sought declaratory and injunctive relief concerning the constitutionality of the Texas picketing statutes. Named as defend-

ants in this action were: (1) the sheriffs of Deaf Smith, Castro, Hale, and Bailey Counties, Texas, in their official capacities, (2) Colonel James B. Adams, Director of the Texas Department of Public Safety, in his official capacity; (3) Roland Saul, in his capacity as Criminal District Attorney for Deaf Smith County, and (4) Jerry Smith and Don Davis, in their capacities as Assistant Criminal District Attorneys for Deaf Smith County.

On July 3, 1980, Plaintiffs amended their complaint to add Delia Gamez (Prince), a seasonal farm worker and a member of the TFWU, as an additional Plaintiff, and Mark White, then Attorney General of the State of Texas, as an additional Defendant.

In their First Amended Complaint, Plaintiffs allege that the language of the temporary restraining order parallels the provisions of Tex.Rev.Civ.Stat.Ann. arts. 5154d, 5154f, and 5154g (Vernon 1971). These provisions of Texas law pertain to labor disputes and provide for both civil and criminal enforcement by either the County or District Attorney.

In No. 2–80–129, Plaintiffs ask the Court to declare Art. 5154d, §§ 1–3; Art. 5154f, §§ 2(b), 2(d), and 2(e); and Art. 5154g, § 2 (Vernon 1971) unconstitutional. Because they anticipate future enforcement of these statutes against them, they seek a permanent injunction enjoining enforcement of the statutes.

Plaintiffs' claims against the sheriffs of Hale, Castro, and Bailey Counties, as well as their claim against Colonel Adams, were dismissed by the Court. Defendant Charles Tue's, sheriff of Hale County, counterclaim and third-party action were also dismissed. At the time of trial, the remaining defendants were: Travis McPherson, Sheriff of Deaf Smith County; Roland Saul, Jerry Smith, and Don Davis, Criminal District and Assistant Criminal District Attorneys for Deaf Smith County; and Jim Mattox, Attorney General of the State of Texas.

This case did not proceed as a class action because of Plaintiffs' failure to comply with Local Rule 10.2(b), which provides

that "within 90 days of the filing of a complaint alleging a class action, the attorney for the plaintiff shall move for certification."

#### C. The Consolidated Actions

On April 6, 1983, No. 2–80–127 was consolidated with No. 2–80–129 for purposes of trial. On June 13, 1983, the consolidated actions came on for trial before the Court, sitting without a jury. The TFWU, through its attorney, moved that its causes of action, filed as a Counter-Plaintiff in No. 2–80–127 and as a Plaintiff in No. 2–80–129, be severed and that they be granted a continuance as to that portion of those cases. The Court denied the motion.

Counsel for the TFWU, Bill Beardall of TRLA, then stated, on the record, that he would not present any evidence or request any relief on behalf of the TFWU. He stated that all evidence presented would be on behalf of Counter-Plaintiff Moya (No. 2–80–127) and Plaintiffs TRLA and Delia Gamez (No. 2–80–129). He further stated that even if evidence offered on behalf of another party might also bear on TFWU's claim, that, at the instruction of the TFWU, he was not seeking any relief on its behalf. Accordingly, the Court dismissed all causes of action of the TFWU in both actions, leaving Moya as the only claimant for relief in No. 2–80–127, and TRLA and Delia Gamez as the only claimants in No. 2–80–129.

#### V. Moya's Claims

Moya contends that his civil rights were violated by the growers' actions.

Specifically, Moya contends that the growers:

(1) "[A]greed and conspired to file this lawsuit to obtain a TRO;"

(2) "[C]onspired to take these actions maliciously and without according [him] ... due process of law;"

(3) "[E]ntered into this conspiracy with the purpose and intention of denying [him and other members of the TFWU] and other Mexican-American farm worker employees of [the growers] ..., as a class, their rights to freedom of speech and assembly, their right to organize to pursue minimum wage claims, and their right to due process of law, and further with the purpose and intention of harassing [them] ... in the free exercise of those rights;"

(4) Conspired with the Criminal District Attorneys' office in Deaf Smith County to file this action and obtain a temporary restraining order "in bad faith and with malicious abuse of process" because they "knew they had no possibility of success on the merits and that certain of their claims for relief were based upon unconstitutional provisions of Art. 5154 et seq.;" and

(5) Conspired with the state judge who issued the temporary restraining order against him to use "the full coercive powers of the State courts to enforce the growers unlawful objectives."

#### A. § 1983

To recover under § 1983, Moya must show that the growers (1) acted under color of state law, and (2) while so acting, deprived him of a right secured by the Constitution and laws of the United States.

#### 1. Color of State Law.

■ In *Lugar v. Edmondson Oil Co.,* 457 U.S. 922, 102 S.Ct. 2744, 73 L.Ed.2d 482 (1982), the Supreme Court set forth a two-step test for determining whether an action is taken under color of state law for purposes of § 1983:

> First, the deprivation must be caused by the exercise of some right or privilege created by the State or by a rule of conduct imposed by the State or by a person for whom the State is responsible ... Second, the party charged with the deprivation must be a person who may fairly be said to be a state actor. This may be because he is a state official, because he has acted together with or has obtained significant aid from state officials, or because his conduct is otherwise chargeable to the State. *Id.* at 937, 102 S.Ct. at 2753–54.

The Court noted each case must be examined on its own facts and that its holding was "limited to the particular context of prejudgment attachment." *Id.* at 939 & n.

21, 102 S.Ct. at 2755 & n. 21. Consistent with this holding, the Fifth Circuit has found private litigants to have acted under color of state law when they invoked Louisiana's attachment law, *Folsom Investment Co. v. Moore*, 681 F.2d 1032, 1037 (5th Cir.1982), and Mississippi's replevin statute, *Hollis v. Itawamba County Loans*, 657 F.2d 746 (5th Cir.1981). At the same time, it has affirmed that:

> Private misuse of a state statute alone does not describe conduct that can be attributed to the state. It is the procedural scheme created by the statute that is state action, and therefore subject to constitutional restraints.

*Earnest v. Lowentritt*, 690 F.2d 1198, 1201 (5th Cir.1982).

> Thus, insofar as [plaintiffs] have alleged that the [statutory] scheme is violative of the constitution, the private parties who set that scheme in motion acted under color of state law. *Folsom Investment*, 681 F.2d at 1037.

Here, the growers who filed suit against Moya were private litigants, not state officials. They sought injunctive relief under the Texas picketing statutes, which prescribe certain rules of conduct for picketers and explicitly provide a private right of action for violations. Arts. 5154f, § 4 and 5154g, § 4.

In *District 28, United Mine Workers of America v. Wellmore Coal Corp.*, 609 F.2d 1083 (4th Cir.1979), the Court found that coal companies which had obtained *ex parte* injunctions from state courts restricting the picketing activities of the plaintiff unions had not acted under color of state law. *Accord, Louisville Area Inter-Faith Committee for United Farm Workers v. Nottingham Liquors*, 542 F.2d 652 (6th Cir.1976).

The Fifth Circuit reached the opposite conclusion in a pre-*Lugar* case, *Gresham Park Community Organization v. Howell*, 652 F.2d 1227 (5th Cir.1981). In *Gresham Park*, a community organization began picketing a new liquor store it opposed. The liquor store owner sued in state court and obtained a TRO enjoining the picketing. After efforts to obtain relief in state court proved unsuccessful, the community organization filed suit in federal court under § 1983. The defendants argued, among other things, that they had not acted under color of state law. After an extended discussion, the Fifth Circuit concluded that:

> [W]here a state court makes a ruling arguably infringing upon first amendment rights and the ruling is based on a state-created prohibitory rule, be it common law or statutory, the suit loses its private nature.... Because the same factor is present here, we find state action. *Id.* at 1239.

*Gresham Park* is not controlling in this case because the Fifth Circuit's analysis stops short after the first *Lugar* factor. Here, as in *Gresham Park*, any deprivation was "caused by the exercise of some right or privilege created by the state or by a rule of conduct imposed by the State," thus meeting the first *Lugar* requirement. But while the Fifth Circuit stopped here in *Gresham Park*, a pre-*Lugar* case, this Court must continue to the second *Lugar* requirement: may the growers fairly be said to be state actors?

In *Lugar*, a creditor obtained, *ex parte*, a writ of attachment from the Clerk of the state court. The writ was executed by the County Sheriff. Citing its earlier holding in *Adickes v. S.H. Kress & Co.*, 398 U.S. 144, 152, 90 S.Ct. 1598, 1605, 26 L.Ed.2d 142 (1970), that "[p]rivate persons, jointly engaged with state officials in the prohibited action, are acting under color of law for purposes of [§ 1983]," the Court concluded that the second requirement had been met, "[w]hatever may be true in other contexts." 457 U.S. at 942, 102 S.Ct. at 2756.

Here, it may fairly be said that the growers were state actors because they acted together with and obtained significant aid from state officials.

The growers employed Roland Saul, Jerry Smith and Don Davis as their attorneys in the civil suit. As discussed above, Saul was the Criminal District Attorney of Deaf

Smith County. Smith and Davis were his assistants. Under Texas law:

> The Criminal District Attorney and his assistants shall have the right and it shall be their *primary duty* to represent the State of Texas in criminal and civil cases in the District Court and inferior courts of Deaf Smith County. He shall have and exercise in addition to the specific powers given and duties imposed upon him and his assistants by this Act, all powers, duties, and privileges within Deaf Smith County as are now by law conferred and which may hereafter be conferred on County Attorneys and District Attorneys in various counties and judicial districts of this State relative to criminal and civil matters for and in behalf of the County and the State of Texas.

Tex.Rev.Civ.Stat.Ann. art. 326k–64 (Vernon 1973) (emphasis added).

▐ Of course, simply retaining as counsel a person who also serves as a county or district attorney does not mean that a private litigant is acting under color of state law in any subsequent litigation. Here, Saul's, Smith's, and Davis' civil representation closely interlocked with their criminal prosecution duties. The picketing statutes authorize county or district attorneys to institute suits for injunctive relief for picketing violations. Arts. 5154f, § 5; 5154g, § 5. The mass picketing and secondary picketing statutes provide misdemeanor criminal sanctions for their violation. Arts. 5154d, § 5; 5154f, § 3. The same conduct which will support a civil suit by a private litigant for injunctive relief and damages will also support a criminal prosecution or a suit for injunctive relief brought in the name of the State.

Jerry Smith served as lead counsel for the growers. He handled both his private practice and his assistant criminal district attorney's duties out of the firm offices of

Saul, Smith & Davis. While preparing the growers' state court petition, he telephoned Gilbert Pena, an attorney with the County and State Division of the Attorney General's office in Austin to discuss the enforceability and constitutionality of the picketing statutes. (This appears to be the same Gilbert Pena who represented the State of Texas and signed the final judgment on behalf of the State in the *Medrano* litigation, discussed in Part IX of this Opinion, *infra*.) Smith testified that he asked for relief based on the mass picketing statute "because of the advice given me by the Attorney General's office." Smith also testified that it was Pena who first suggested asking for a TRO. Because of the "totality of the facts," Smith decided on a private civil suit instead of a criminal prosecution or an injunctive relief suit brought on behalf of the State. A probable consideration in this decision was his ability to bill the growers for private representation, something he could not do for discharging his public duties.

Smith's consultation with the Attorney General's office could only have been in his official capacity as an Assistant Criminal District Attorney for Deaf Smith County. Under Art. 4399, the Attorney General may "advise the several district and county attorneys of the State, in the prosecution and defense of all actions in the district or inferior courts, wherein the State is interested, whenever requested by them," but is expressly prohibited from "giving legal advice or written opinions to any other than the officers or persons named herein." Private civil counsel are not named in the statute.

Roland Saul had conversations with several deputy sheriffs to find out what was happening on the picket lines, with an interest from both the civil side and "the law enforcement angle."[1] He obtained affida-

---

1. The aura of official action inherent in private civil representation by a public prosecutor has resulted in special ethical constraints on prosecutors, lest their private representation be confused for action on behalf of the state.

Saul, Smith and Davis all proceeded on the assumption that they could undertake civil representation of the growers so long as they disqualified themselves from any subsequent criminal prosecution arising out of the TFWU's organizing efforts. In decisions under the Canons

vits from two deputies, which were used to support the issuance of the TRO.

Don Davis met with deputies during the strike to explain the trespass and picketing laws, including the 50-foot spacing rule in the mass picketing statute.

Larry Burlsmith, an investigator employed by the Criminal District Attorney's office, who is authorized to make arrests and has "all the rights and duties of a peace officer in criminal cases," Art. 326k–64, § 4, went to view the picket lines on his work time and reported his observations to Saul. He accompanied Sheriff McPherson when the TRO was served on TRLA.

McPherson and his deputies served the TRO on the various state court defendants. After the TRO's issuance, county deputies continued to observe and videotape the picketers. After the sheriff's department's videotape equipment broke down, the Texas Citrus & Vegetable Growers Association, one of the state court plaintiffs, loaned the sheriff's department some equipment they had brought up from the Valley.

The Court concludes that the growers were acting under color of state law. They acted together with and obtained significant aid from state officials, including the Criminal District Attorney's office, the sheriff's department, and the Texas Attorney General's office. As the Fifth Circuit has said, "[t]he application of the tests for state action is not mechanical.... State action may manifest itself in a wide variety of forms, some of which do not fit neatly in any category." *Roberts v. Louisiana Downs, Inc.*, 742 F.2d 221, 224 (5th Cir. 1984).

## 2. Deprivation of Rights.

### (a) 1st Amendment, Substantive

■ If Texas law required Moya to abide by the terms of the TRO, then his First Amendment rights clearly would have been infringed for the reasons discussed in Part

of Ethics, replaced by the Code of Professional Responsibility in 1971, the State Bar of Texas Committee on Interpretation of the Canons of Ethics held that this conduct is inappropriate.

In Opinion No. 332 (1967), *reprinted in* 23 Baylor L.Rev. 863–65 (1972), the Committee said:

The client of a prosecuting attorney is the public body and his primary duty is to the public. That duty requires him to investigate complaints within his jurisdiction and to proceed in accordance with the interests of justice.... Obviously no outside interest should be permitted to conflict with or interfere with the performance of those duties and it seems apparent that if a public prosecutor undertakes the representation of a civil litigant in a case arising out of an occurrence which is also the subject of a criminal investigation there would likely be a conflict of interest which ... would disqualify the public prosecutor from representing the civil litigant....

In Opinion 312 (1966), [*reprinted in* 23 Baylor L.Rev. 836 (1972) ], we further held that it is unethical for a prosecuting attorney to represent a civil litigant when his duty *might* require investigation or prosecution of a criminal action arising out of the same facts. We reaffirm [that opinion].

The controlling principle which we here lay down is that if a public prosecutor is in fact employed or contemplates being employed to represent one of the parties in a civil matter at any time when his duties as public prosecutor require investigation of a potential criminal charge or prosecution of a criminal charge against one of the parties to the transaction which is or will be involved in the civil matter, he is disqualified by reason of an actual or potential conflict of interest. If however, his duties as public prosecutor have been fully performed and terminated at the time he is approached with respect to civil representation and if he has gained no confidential information by reason of his public office, he would not be ethically disqualified to represent one of the parties in the civil matter.

In representing civil litigants, a public prosecutor must also carefully avoid the use of his official office and its facilities, investigators, etc.

*Accord,* American Bar Association Opinion No. 135 (March 15, 1935).

Here, Saul's, Smith's, and Davis' duties as public prosecutors had not been fully performed and terminated at the time they undertook civil representation of the growers. Instead, as discussed above, Saul was actively interested in "the law enforcement angle." (Indeed, in 1982, while Saul, Smith and Davis were still counsel of record for the growers in this litigation, the Deaf Smith County Criminal District Attorney's office undertook the criminal prosecution of Moya on an unrelated trespass charge.) They also received regular reports from deputy sheriffs and from the investigator employed by the Criminal District Attorney's Office.

XI of this Opinion, *infra,* relating to the constitutionality of the picketing statutes.

Moya argues that he had no choice but to obey the TRO after it was issued because defiance would have led to contempt proceedings in which his constitutional claims could not have been raised. *Walker v. City of Birmingham,* 388 U.S. 307, 87 S.Ct. 1824, 18 L.Ed.2d 1210 (1967). This is not the law in Texas. If Moya had violated the terms of the TRO, he could have raised his constitutional claims in the subsequent state court proceedings. *Ex parte Pierce,* 161 Tex. 524, 342 S.W.2d 424 (1961); *Ex parte Twedell,* 158 Tex. 214, 309 S.W.2d 834 (1958); *Ex parte Henry,* 147 Tex. 315, 215 S.W.2d 588 (1948).

In *Henry,* for example, the relators had been incarcerated for violating a temporary injunction enjoining them from picketing within 100 feet of some railroad tracks. There was no question that they had violated the terms of the temporary injunction. In an original habeas corpus proceeding, the Supreme Court of Texas found that:

> [W]hen the trial court ordered relators not to picket within 100 feet of the spur tracks when the railways were using or about to use them, he was abridging the right of free speech guaranteed them by the Constitution. So, in so far as the injunction judgment entered by the trial court attempted to restrain peaceful picketing at, near, across or within 100 feet of the railway tracks across Pickett Street, it is void.... [T]he order of commitment for contempt is likewise void. One cannot be punished for contempt for violating an order which a court has no authority to make. *Id.* 215 S.W.2d at 596–97.

The relators were discharged from custody. Similarly, the relator in *Twedell,* another picketing injunction case, successfully raised his preemption argument in the Texas Supreme Court and was discharged from custody. At the same time, though, Moya could not have challenged the sufficiency of the evidentiary basis for the TRO in a contempt proceeding. *Pierce,* 342 S.W.2d at 427. The United States Supreme Court has recognized and applied this practice in reviewing decisions of the Texas Supreme Court. *See, e.g., Thomas v. Collins,* 323 U.S. 516, 65 S.Ct. 315, 89 L.Ed. 430 (1945) (reversing, on First Amendment grounds, the Texas Supreme Court's denial of habeas corpus relief to a union organizer found in contempt for giving a speech in violation of a state district court's temporary injunction); *but see Vance v. Universal Amusement Co.,* 445 U.S. 308, 316, 100 S.Ct. 1156, 1161, 63 L.Ed.2d 413 (1980) (assuming Texas law to be otherwise).

Nonetheless, even if one accepts that Moya's ability to raise his constitutional claims in a contempt proceeding precludes classifying the TRO as a prior restraint on his speech, the facts of this case plainly disclose that Moya's exercise of his First Amendment rights was chilled by the TRO. Thus those rights were violated.

> Where the use of coercive power is threatened, First Amendment rights may be violated by the chilling effect of governmental action that falls short of a direct prohibition against speech. The exercise of First Amendment freedoms may be deterred almost as potently by the threat of sanctions as by their actual application.

*Aebisher v. Ryan,* 622 F.2d 651, 655 (2d Cir.1980) (citations omitted); *Dombrowski v. Pfister,* 380 U.S. 479, 486, 85 S.Ct. 1116, 1120, 14 L.Ed.2d 22 (1965). The growers' vigorous prosecution of the suit, their use of the Criminal District Attorney and his assistants as counsel, and the presence of sheriff's deputies with videotape equipment on the picket lines constituted an open threat of using the state's coercive power. As one scholar has commented:

> Even if the [constitutional claims could be raised in a contempt proceeding], it might well remain the case that prepublication restraints, especially those affirmatively singling out the would-be disseminator, would deter far more protected conduct than criminal statutes ordinarily would. The latter is essentially a mute, impersonal threat; being told personally not to publish is apt to cause more sec-

ond thoughts—no matter what defenses are ultimately available.

L. Tribe, *American Constitutional Law,* § 12–32 at 726 n. 2 (1978). *Accord, Bernard v. Gulf Oil Co.,* 619 F.2d 459, 469 n. 15 (5th Cir.1980) (en banc), *aff'd,* 452 U.S. 89, 101 S.Ct. 2193, 68 L.Ed.2d 693 (1981) ("One who may be willing to violate a statute, and thus risk criminal penalties, may be less willing to act in direct defiance of an injunction or court order and thus subject himself to the ·court's potential contempt power.")

This case exemplifies such a situation. The criminal sanctions in the picketing statutes failed to deter the picketers, but the TRO, which essentially prohibited no more than the statutes, dramatically reduced Moya's exercise of his First Amendment rights. The TRO intimidated many of the picketers, causing them to return to work in the fields. At a time when creating trust and confidence in the TFWU was essential, Moya could hardly risk a contempt citation. As noted above, after the TRO issued, even some TFWU officers questioned Moya's ability to organize peacefully. Any protracted contempt proceedings would have destroyed the immediacy of Moya's picketing and speeches because of the short term of the onion harvest season. "First Amendment rights are often lost or prejudiced by delay." *Id.* at 470.

### (b) 1st Amendment, Procedural

■ Moya also claims that the *ex parte* procedure used by the growers to obtain the TRO violated his First Amendment rights.

In *Carroll v. President and Commissioners of Princess Anne,* 393 U.S. 175, 89 S.Ct. 347, 21 L.Ed.2d 325 (1968), members of a "white supremacist" organization called the National States Rights Party held a public rally in the town of Princess Anne at which they gave agressively and militantly racist speeches directed at Blacks and Jews. Because of the tense atmosphere, more than 60 police officers were present to keep the peace. At the end of the rally, the organizers announced that another rally would take place the following night, at which time they would "raise a little bit of hell for the white race." The next day, city and county officials sought and obtained a court order restraining the organizers from holding another rally for ten days. The order was issued *ex parte,* with no notice to the organizers, or even any informal communication with them. The Supreme Court concluded that the procedure followed in obtaining the restraining order infringed on the organizers' First Amendment rights:

> The 10-day order here must be set aside because of a basic infirmity in the procedure by which it was obtained. It was issued *ex parte,* without notice to petitioners and without any effort, however informal, to invite or permit their participation in the proceedings. There is a place in our jurisprudence for *ex parte* issuance, without notice, of temporary restraining orders of short duration; but there is no place within the area of basic freedoms guaranteed by the First Amendment for such orders where no showing is made that it is impossible to serve or to notify the opposing parties and to give them an opportunity to participate. *Id.* at 180, 89 S.Ct. at 351.

The TRO in this case was issued *ex parte,* without formal or informal notice to Moya or his attorneys. Jerry Smith, who spent upwards of five hours at the courthouse in Hereford trying to obtain the TRO, testified at trial as to why no notice was given:

Q. Did you at any of that ... during any of that time give notice to TRLA you were seeking a restraining order?

A. No, sir.

Q. Why not?

A. My experience in dealing with them in the past, it would have done absolutely no good to visit with them. They will not compromise in any respect, will not rationally discuss anything in any respect....

Q. Now, aside from the hearing on temporary injunction, I take it, you did not read [Tex.R.Civ.P. 680] to suggest you

should give notice of the seeking of a temporary restraining order so that counsel who wished to oppose it could be heard, at least, in chambers or in conference?

A. I believe that was up to the Court.

Q. Not up to you? You don't have an obligation under the Rules?

A. I believe that's up to the Court to decide.

Q. And I ask you, do you have an obligation under the Rules?

A. No, sir.

The TRLA offices in Hereford are within walking distance of the courthouse. Nothing prevented Smith from giving notice. Instead, he made no attempt whatsoever.

The Court concludes that the procedure followed in obtaining the TRO violated Moya's First Amendment rights.

### (c) 6th Amendment

■ Moya asserts that the TRO also deprived him of his Sixth Amendment right to counsel. This contention is without merit. The Sixth Amendment right to counsel attaches at the time adversary judicial proceedings are initiated by way of formal charge, preliminary hearing, indictment, information or arraignment. *See Brewer v. Williams*, 430 U.S. 387, 398, 97 S.Ct. 1232, 1239, 51 L.Ed.2d 424 (1977); *Kirby v. Illinois*, 406 U.S. 682, 688–89, 92 S.Ct. 1877, 1881–82, 32 L.Ed.2d 411 (1972). The express terms of the Amendment limit its protections to criminal prosecutions. Since no criminal prosecution was initiated against Moya during the time relevant here, his Sixth Amendment right to counsel never attached and, thus, he could not have been deprived of that right.

### (d) Legal Services Corporation Act

Moya finally contends that the growers deprived him of his statutory right to free legal counsel under the Legal Services Corporation Act, 42 U.S.C. § 2996, *et seq.* (1982).

■ A deprivation under color of state law of a right secured by the laws of the United States is actionable under § 1983.

*Maine v. Thiboutot*, 448 U.S. 1, 4, 100 S.Ct. 2502, 2504, 65 L.Ed.2d 555 (1980). There are two exceptions to this principle: (1) "[w]hen the remedial devices provided in a particular Act are sufficiently comprehensive, they may suffice to demonstrate congressional intent to preclude the remedy of suits under § 1983," *Middlesex County Sewerage Authority v. National Sea Clammers Association*, 453 U.S. 1, 20, 101 S.Ct. 2615, 2626, 69 L.Ed.2d 435 (1981); and (2) there is no remedy under § 1983 if the statute violated is not of the kind that creates enforceable "rights" under § 1983, *id.* at 19, 101 S.Ct. at 2626. *See Pennhurst State School and Hospital v. Halderman*, 451 U.S. 1, 28, 101 S.Ct. 1531, 1545, 67 L.Ed.2d 694 (1981); *Irby v. Sullivan*, 737 F.2d 1418, 1428 (5th Cir.1984).

■ To establish the first exception:

[T]he burden is properly placed on the defendant to show that Congress, in enacting the particular substantive statute at issue, intended an exception to the general rule of § 1983. A defendant may carry this burden by identifying express statutory language or legislative history revealing Congress' intent to foreclose the § 1983 remedy, or by establishing that Congress intended that the remedies provided in the substantive statute itself be exclusive.

*Sea Clammers*, 453 U.S. at 27 n. 11, 101 S.Ct. at 2630 n. 11 (Stevens, J., concurring and dissenting); *cf. id.* at 20 n. 31, 101 S.Ct. at 2626 n. 31. The growers have not suggested that this exception applies and, thus, have not carried the burden of establishing its applicability.

With respect to the second exception, the question is whether the Legal Services Corporation Act creates rights which are enforceable under § 1983.

The Legal Services Corporation was established by Congress in 1974 as a private, nonmembership nonprofit corporation in the District of Columbia to provide "financial support for legal assistance in noncriminal proceedings or matters to persons financially unable to afford legal assist-

ance." 42 U.S.C. § 2996b(a). The Corporation itself does not provide legal assistance. It provides financial assistance, through annual Congressional appropriations received by the Corporation, to qualified programs furnishing legal assistance to individuals who qualify under financial eligibility criteria prescribed by the Corporation. 42 U.S.C. §§ 2996e(a)(1) & 2996f(a)(2).

TRLA is a nonprofit Texas corporation and a recipient of funds from the Corporation. As a recipient, it was responsible for establishing the maximum annual income level for persons to be eligible to receive legal assistance, and priorities for the allocation of its resources. 45 CFR §§ 1611.3 & 1620 (1980). Any "right" of Moya to receive legal aid depended on his meeting the eligibility criteria established by TRLA, within the regulatory guidelines, and presenting a need of sufficient priority for TRLA to allocate resources to his representation.

■ A client who feels that he has improperly been denied legal services may pursue an administrative client grievance procedure, 45 CFR § 1621 (1980), but he cannot sue in federal court. *Nabke v. U.S. Department of Housing and Urban Development,* 520 F.Supp. 5 (W.D.Mich.1981). Similarly, there is no private cause of action under the Act for persons aggrieved by violations of the Act. *Grassley v. Legal Services Corp.,* 535 F.Supp. 818 (S.D.Iowa 1982).

■ The Act is designed to provide a mechanism for funding legal assistance to those unable to afford it. The Act does not create in the indigent any right to legal services which is enforceable under § 1983. *See Pennhurst,* 451 U.S. at 18–20, 101 S.Ct. at 1540–41 (no enforceable rights arising from "bill of rights" provision of the Developmentally Disabled Assistance and Bill of Rights Act of 1975); *Boatowners and Tenants Association v. Port of Seattle,* 716 F.2d 669 (9th Cir.1983) (no enforceable rights arising from the River and Harbor Improvements Act); *Perry v. Housing Authority of the City of Charleston,* 664 F.2d 1210, 1217 (4th Cir.1981)

("The plaintiffs have not pointed to any substantive provisions of the various housing acts which give them any tangible right, privilege, or immunity").

■ Even if the Court assumes that Moya had such an enforceable right, no deprivation could be found. Moya's counsel removed the state suit to federal court the day it was filed. The next day, they moved to dissolve or modify the TRO; filed an opt-in FLSA class action alleging minimum wage violations against the Howard Gault Co., one of the key players in the suit against Moya (*Lucio v. Howard Gault Co.,* Civil Action No. 2–80–130; and filed No. 2–80–129, challenging the constitutionality of the Texas picketing statutes. Two days later, they obtained a modification of the TRO. By the end of July, Moya had successfully opposed any extension of the TRO, moved for a union representation election, and noticed the depositions of every state court plaintiff.

This vigorous representation aside, Moya argues that he was deprived of his right to receive legal advice while on the picket line. The Legal Services Corporation Act provides that:

> The Corporation shall insure that no employee ... of any recipient (except as permitted by law in connection with such employee's own employment situation), while carrying out legal assistance activities under [the Act], engage in, or encourage others to engage in, any public demonstration or picketing, boycott, or strike.... 42 U.S.C. § 2996e(b)(5)(A).

Pursuant to this direction, the Corporation has promulgated a regulation prohibiting such activities, 45 CFR § 1612.2(a) (1980), with an explanation:

> Nothing in this part shall prohibit an attorney from ... [a]ttending a public demonstration, picketing, boycott, or strike for the purpose of providing legal assistance to a client.... *Id.* § 1612.-3(b).

Those portions of the TRO directed solely at TRLA tracked this statutory language, thus facially not prohibiting any-

thing more than was already prohibited by statute and regulation. Ed Tuddenham, a TRLA attorney, testified that the TRO's effect went beyond its words. Prior to the TRO, Tuddenham had gone out to the picket lines almost every day; afterwards, he went only occasionally. All of the TRLA attorneys maintain that they never engaged in any prohibited conduct.

Moya was unable to describe any particular deprivation that he suffered. TRLA continued to represent both him and the TFWU. Picketers on several occasions went to the TRLA offices in Hereford, albeit under surveillance by the sheriff's department, and received legal advice. Moya's testimony concerning any deprivation was abstract:

Q Mr. Moya, could you explain to the Court if and why having attorneys present on the picket line is important to you instead of just having them in an office to advise you?

A Well, it's for us ... it's comfortable, you know, to have an attorney present because the fear of being arrested, you know, and knowing your rights, it's ... you know, it's present, you know.

Q Are there any things that you need to have someone present there immediately to give you advice about, that you wouldn't have time, for instance, to go to an office to obtain?

A That is correct. We need them right there in the area where we're striking.

The record lacks the concrete facts necessary for finding any deprivation or injury. Thus, even assuming that the Act gives Moya a right to counsel enforceable under § 1983 and, further, a right to receive legal advice on a picket line enforceable under § 1983, no deprivation has been shown.

### (e) Malicious Prosecution

The parties have argued at some length the question of whether Moya pleaded a counterclaim based on malicious prosecution. As the growers point out, Moya's three counterclaims are based on three provisions of the Civil Rights Act of 1871: § 1983, § 1985(2), and § 1985(3). No pen-dent state law claim for malicious prosecution has been pleaded.

■ To the extent that Moya's malicious prosecution claim is cognizable under § 1983, see Wheeler v. Cosden Oil & Chemical Co., 734 F.2d 254 (5th Cir.1984); Shaw v. Garrison, 467 F.2d 113 (5th Cir. 1972), he cannot prevail because the state court proceeding was civil, not criminal. Both Wheeler and Shaw rest on the protections afforded criminal defendants by the Fourth and Fourteenth Amendments, protections that do not extend to defendants in civil suits even if the civil action is brought by persons acting under color of state law. Beker Phosphate Corp. v. Muirhead, 581 F.2d 1187 (5th Cir.1978). In Beker Phosphate, Sarasota County, Florida, allegedly systematically misused legal procedure to delay opening of a phosphate mine by filing a series of appeals when it lacked standing. Using the term "misuse of legal procedure" to encompass malicious prosecution, wrongful civil proceedings, and abuse of process, the Fifth Circuit concluded that "§ 1983 does not provide a remedy for such a claim of misuse of legal procedure." Id. at 1188 n. 1 & 1189.

### B. § 1985

■ Our discussion of Moya's claims under §§ 1985(2) and (3) is much abbreviated by the Supreme Court's recent decision in United Brotherhood of Carpenters and Joiners of America v. Scott, 463 U.S. 825, 103 S.Ct. 3352, 77 L.Ed.2d 1049 (1983).

In relevant part, § 1985(2) prohibits conspiracies "for the purpose of impeding, hindering, obstructing, or defeating, in any manner, the due course of justice in any State or Territory, with intent to deny to any citizen the equal protection of the laws;" and § 1985(3) prohibits conspiracies "for the purpose of depriving, either directly or indirectly, any person or class of persons of the equal protection of the laws."

"Each of these portions of the statute contains language requiring that the conspirators' actions be motivated by an intent to deprive their victims of the equal protec-

tion of the laws." *Kush v. Rutledge,* 460 U.S. 719, 103 S.Ct. 1483, 1487, 75 L.Ed.2d 413 (1983).

"The language requiring intent to deprive of equal protection ... means that there must be some racial, or perhaps otherwise class-based, invidiously discriminatory animus behind the conspirators' action." *Griffin v. Breckenridge,* 403 U.S. 88, 102, 91 S.Ct. 1790, 1798, 29 L.Ed.2d 338 (1971).

In *Scott,* the Supreme Court discussed the type of animus required by this language in § 1985(3):

> We ... cannot construe § 1985(3) to reach conspiracies motivated by economic or commercial animus. Were it otherwise, for example, § 1985(3) could be brought to bear on any act of violence resulting from union efforts to organize an employer or from the employer's efforts to resist it, so long as the victim merely asserted and proved that the conduct involved a conspiracy motivated by an animus in favor of unionization, or against it, as the case may be. 103 S.Ct. at 3360–61.

Presumably the same language has the same effect on the second portion of § 1985(2), i.e., the second portion of § 1985(2) does not reach conspiracies motivated by economic or commercial animus.

The conspiracy against Moya stood squarely on a bedrock of anti-union animus. The growers acted in what they perceived to be their own economic and commercial best interests. Moya was not sued because he was Hispanic or an outsider. He was sued because his union organizing efforts interfered with the growers' onion harvest. TRLA was sued for the same reason and also because the growers couldn't resist taking a shot at these "carpetbaggers" from Harvard. This latter motive, though, did not relate to Moya, and the suit as a whole "generally rest[ed] on economic motivations." *See Id.* Without the requisite discriminatory animus, Moya's claims under § 1985 must fail.

## VI. Immunity

In *Folsom Investment Co. v. Moore,* 681 F.2d 1032, 1033 (5th Cir.1982),

the Fifth Circuit held that "a private party who invokes a presumptively valid state ... statute is entitled to a good faith immunity from monetary liability under § 1983." The court adopted the standard prescribed by the Supreme Court for state officials performing discretionary functions. *Id.* at 1037. See *Harlow v. Fitzgerald,* 457 U.S. 800, 818–19, 102 S.Ct. 2727, 2738, 73 L.Ed.2d 396 (1982).

This inquiry, applied to this context, turns on whether the unconstitutionality of the statute was clearly established at the time the action occurred. "If the law at that time was not clearly established, an official could not reasonably be expected to anticipate subsequent legal developments, nor could he fairly be said to 'know' that the law forbade conduct not previously identified as unlawful." *Id.* at 818, 102 S.Ct. at 2738. *Accord, Davis v. Scherer,* — U.S. ——, 104 S.Ct. 3012, 3021, 82 L.Ed.2d 139 (1984).

As discussed in Part IX of this Opinion, *infra,* the first federal court to consider the constitutionality of many of the picketing statutes relied on by the growers, initially found several of them unconstitutional, but ultimately rendered no decision on the constitutional issues. *Medrano v. Allee,* 347 F.Supp. 605 (S.D.Tex.1972) (3-judge court), *vacated in relevant part,* 416 U.S. 802, 94 S.Ct. 2191, 40 L.Ed.2d 566 (1974). Thus *Medrano* did not clearly establish the unconstitutionality of Art. 5154d §§ 1(1) and 1(2), and Art. 5154f. Similarly, no court had even suggested that Art. 5154d, §§ 2 and 3, and Art. 5154g, § 2 were unconstitutional.

Nonetheless, the unconstitutionality of the minority picketing provisions of Art. 5154f, relied on by the growers in obtaining the TRO, had been clearly established more than three decades earlier by the Texas Supreme Court. *International Union of Operating Engineers v. Cox,* 148 Tex. 42, 219 S.W.2d 787 (1949); *Construction and General Labor Union v. Stephenson,* 148 Tex. 434, 225 S.W.2d 958 (1950). See Part XI, E of this Opinion, *infra.* The unconsti-

tutionality of the *ex parte* procedure used by the growers to obtain the TRO had been clearly established twelve years earlier in *Carroll v. President and Commissioners of Princess Anne*, 393 U.S. 175, 89 S.Ct. 347, 21 L.Ed.2d 325 (1968). Thus the growers do not have immunity from monetary liability for the damages flowing from use of the minority picketing provisions of Art. 5154f and the *ex parte* TRO procedure.

### VII. Damages

The right to demonstrate is a significant strand of the cluster of First Amendment rights. The vindication of these rights warrants more than token acknowledgment.... Compensation for denial of First Amendment rights should not be extravagant, say to the point of awarding the equivalent of what would be a year's, or even six month's compensation for the average person. Correspondingly such a compensation award should not be approached in a [miserly] spirit. It is in the public interest that there be a reasonably spacious approach to a fair compensatory award for denial or curtailment of the right to demonstrate.

*Tatum v. Morton*, 562 F.2d 1279, 1282 (D.C.Cir.1977) ($100 did not suffice to compensate plaintiffs for the interruption of their Quaker vigil in front of the White House; on remand, each plaintiff was awarded approximately $1000, *Hobson v. Wilson*, 556 F.Supp. 1157, 1191 (D.D.C. 1982)). *Cf. Hobson v. Wilson*, 737 F.2d 1, 58 (D.C.Cir.1984) ($3125 excessive compensation for FBI's denial, through planned disruptions of antiwar and civil rights demonstrations, of plaintiff's full association with other persons for pursuit of his social and political causes); *Dellums v. Powell*, 566 F.2d 167 (D.C.Cir.1977) ($7500 excessive compensation for the actual loss of an opportunity to demonstrate caused by unlawful removal from the steps of the U.S. Capitol and detention by police; on remand the district court fixed damages at $750, *Dellums v. Powell*, No. 2271-71 (D.D.C. Dec. 13, 1979), cited in *Hobson*, 556 F.Supp. at 1191 n. 41).

The basic purpose of a § 1983 damages award is to compensate persons for injuries caused by the deprivation of constitutional rights. *Carey v. Piphus*, 435 U.S. 247, 254, 98 S.Ct. 1042, 1047, 55 L.Ed.2d 252 (1978). Mere proof of the violation of a right will not support an award of damages absent proof of actual injury. *Id.* at 262–63, 98 S.Ct. at 1051–52; *Familias Unidas v. Briscoe*, 619 F.2d 391, 402 (5th Cir.1980). If no actual injury is shown as the result of a deprivation of First Amendment rights, only nominal damages not to exceed one dollar may be awarded. *Carey*, 435 U.S. at 266–67, 98 S.Ct. at 1053–54; *Familias Unidas*, 619 F.2d at 402.

Mental or emotional distress may be compensated with an award of damages. *Carey*, 435 U.S. at 263–64, 98 S.Ct. at 1052; *Franks v. Smith*, 717 F.2d 183, 186 (5th Cir.1983). "We use the term 'distress' to include mental suffering or emotional anguish. Although essentially subjective, genuine injury in this respect may be evidenced by one's conduct and observed by others.... [A]n award of damages must be supported by competent evidence concerning the injury." *Carey*, 435 U.S. at 264 n. 20, 98 S.Ct. at 1052 n. 20.

Injury to reputation may also be compensated as an element of damages suffered as a result of the deprivation of First Amendment rights. *Marrero v. City of Hialeah*, 625 F.2d 499, 514 (5th Cir. 1980), *cert. denied*, 450 U.S. 913, 101 S.Ct. 1353, 67 L.Ed.2d 337 (1981). "[T]o the extent the unconstitutional conduct *caused* injury to appellants' personal or business reputations, the injury is compensable as an element of damages flowing from the unlawful conduct." *Id.*

At trial, Moya testified:

Q How did this effect you personally?

A Well, personally, I mean, I have committed my whole life to improving the conditions of farm workers. My family is involved in it.

I personally, you know, feel proud, you know, to be involved in this struggle to

better the situation of these farm workers that have been discriminated for such such a long time.

And when all of a sudden, I'm presented with a restriction order that makes me the person, you know, that has been struggling for justice and equality, a criminal, it definitely has a tremendous impact on my personality and on myself. Because, you know, in the eyes of ... I lost face in the eyes of people.

Q What do you mean you lost face in the eyes of people?

A You know, on the one hand, here we have a peaceful picketing in this area, and then all of a sudden, there is coming out in the news, you know, with this restriction order that we've been slanderous, that there was rock throwing, that we were being violent, you know.

So all those things, you know, effect my image that I'm trying to portray to the workers to be able to persuade them to join us in our just cause for justice and equality.

Q Did ... the issuance of the restraining order effect your reputation within the union in any way?

A Yes. It did.

Q Can you explain to the Court how that happened?

A In some ways, I was reprimanded, you know, that, you know, why are you carrying out such ... you know, there were doubts about the capacity, you know, that I have to organize strikes. You know, I've been doing this for ... I've been in charge of the striking activities and the picketing activities for the last, you know, five years in this organization and all of a sudden, you know, my expertise, if you will, you know, to be able to carry out peaceful strikes is being questioned by the leadership of the organization.

 The Court finds that Moya should be awarded $500 as compensatory damages for injury sustained as a consequence of being restrained under the minority picketing provisions of Art. 5154f, and of the improper *ex parte* procedure used to obtain the TRO.

 Punitive damages may awarded in a § 1983 action "when the defendant's conduct is shown to be motivated by evil motive or intent, or when it involves reckless or callous indifference to the federally protected rights of others." *Smith v. Wade,* 461 U.S. 30, 103 S.Ct. 1625, 1640, 75 L.Ed.2d 632 (1983). The Court finds that an award of punitive damages against the growers in this case is not justified, however questionable the conduct of others may have been.

## VIII. Recovery Against the TRO Bond

Apart from the civil rights claims, both Moya and TRLA assert that they are entitled to recover under state law against the bond posted by the growers for damages they sustained because of the wrongfully issued TRO. The growers argue that Moya and TRLA failed to plead properly for any recovery against the bond. The Court agrees that Moya has failed to plead properly for any recovery against the bond, but finds that the question of TRLA's recovery against the bond has been adequately raised by the Pretrial Order.

No recovery may be had against the sureties, Kenneth Rogers and Roland Saul, because they were never served with the papers in this action.

### A. Liability

 In Texas, requiring a bond as a condition of granting a temporary restraining order is to secure payment to the enjoined party of the actual damages which he may sustain as a result of the temporary restraining order, and costs, in the event the order is later held to have been wrongfully issued and is dissolved, in whole or in part, even though the order was not sought maliciously or without probable cause. *City of Houston v. Plantation Land Co.,* 440 S.W.2d 691, 695–96 (Tex.Civ.App.—Houston [14th Dist.] 1969, writ ref'd n.r.e.); *Cone v. City of Lubbock,* 431 S.W.2d 639, 646 (Tex.Civ.App.—Amarillo 1968, writ ref'd n.r.e.). The enjoined party must show that the restraint was

obtained or continued in effect by the wrongful act of the applicant and that it prevented his doing that which he had a legal right to do. *Craddock v. Overstreet*, 435 S.W.2d 607, 609 (Tex.Civ.App.—Tyler 1968, writ ref'd n.r.e.); *Sanitary Appliance Co. v. French*, 58 S.W.2d 159, 164 (Tex.Civ.App.—Amarillo 1933, writ dism'd). An applicant's voluntary withdrawal of his suit after the issuance of a restraining order and prior to a determination on the merits constitutes "a prima facie case of the right to recover damages, and the burden of proof passes to him who obtained the injunction to establish his justification." *Payne v. Nichols*, 176 S.W.2d 961, 964 (Tex.Civ.App.—Galveston 1943, writ ref'd w.o.m.).

Here, as discussed above, the growers voluntarily dismissed their action before trial. The TRO itself was modified by this Court on July 3, 1980, three days after its issuance, by eliminating the 50-foot spacing rule. As discussed elsewhere in this opinion, the TRO effectively prevented TRLA attorneys from counseling their clients at the picket lines. The Court need not decide whether the TRO was wrongfully issued because TRLA has not made any showing of compensable damages.

### B. Damages

▪ Since this bond was posted in state court pursuant to the state rules of civil procedure, state law controls the damages recoverable on the bond. Wright & Miller, Federal Practice & Procedure, § 2974 at 657 (1973). Under Texas law, "an applicant who secures a temporary restraining order wrongfully is liable for the damages caused by the injunction." *Craddock*, 435 S.W.2d at 609.

> The damages that may be recovered from a wrongful injunction include only those damages that result from the operation of the wrongfully obtained injunction. If the injunction was proper in part and improper in part, only the damages that resulted from the improper part may be recovered. 31 Tex.Jur.2d, *Injunctions* § 233 at 363 (1962).

▪ The party wrongfully enjoined cannot recover punitive damages even if the applicant for injunction acted maliciously or fraudulently. *Womack v. McMillan*, 47 S.W.2d 437, 439 (Tex.Civ.App.—Amarillo 1932, no writ). Similarly, he cannot recover attorney's fees incurred in defending against the application for injunction or prosecuting the claim for wrongful injunction. *Garrett v. Kelley*, 6 S.W.2d 414, 417 (Tex.Civ.App.—Amarillo 1928, writ ref'd).

▪ The only damage claim made by TRLA is for $7,170.43 (Px 10), representing the actual cost of staff attorney time spent dealing with the TRO. This is simply a claim for attorney's fees which, as noted above, is not compensable under Texas law. *See Galveston, H. & S.A. Ry. v. Ware*, 74 Tex. 47, 11 S.W. 918, 920 (Tex.1889) (acknowledging that weight of authority in other states is otherwise). The Court finds that TRLA is not entitled to any recovery for damages against the bond.

## IX. Historical Background to the Constitutional Challenges in No. 2–80–129: Of Medrano v. Allee

In No. 2–80–129, TRLA and Delia Gamez, the remaining plaintiffs seeking relief, have asked the Court to declare that certain of the Texas picketing statutes are facially unconstitutional, on either vagueness or overbreadth grounds. This is not the first constitutional challenge to these statutes to come before the federal courts.

In 1966–67, farm worker organizing efforts in the lower Rio Grande Valley by the United Farm Workers Organizing Committee of the AFL–CIO were badly disrupted and finally stopped altogether through state-sanctioned union-busting tactics focused on strict enforcement of the Texas picketing statutes. After extensive harassment and numerous arrests, the union and a group of farm workers brought suit in federal court seeking, *inter alia*, a declaration that Art. 5154d, § 1, relating to mass picketing, and Art. 5154f, relating to secondary strikes, picketing and boycotts, were facially unconstitutional on vagueness and overbreadth grounds. A three-

judge district court declared Art. 5154d, § 1, and Art. 5154f unconstitutional on overbreadth grounds. *Medrano v. Allee,* 347 F.Supp. 605, 622–28 (S.D.Tex.1972). On appeal, the Supreme Court vacated this part of the judgment and remanded the case for further findings and reconsideration in light of *Steffel v. Thompson,* 415 U.S. 452, 94 S.Ct. 1209, 39 L.Ed.2d 505 (1974). *Allee v. Medrano,* 416 U.S. 802, 820, 94 S.Ct. 2191, 2202, 40 L.Ed.2d 566 (1974). In *Steffel,* decided after the district court's decision in *Medrano,* the Court had discussed when federal declaratory and injunctive relief regarding the constitutionality of a state statute was appropriate, if there were no pending state criminal prosecutions for violation of the statute.

On remand, the plaintiffs withdrew their challenge to the facial constitutionality of the statutes. The district court entered an amended final judgment which provided, in relevant part:

8. The Court has been advised by the parties and finds that no criminal prosecutions of any kind or character are pending against Plaintiffs or any member of the class represented by Plaintiffs as described in Paragraph 2 of this Judgment, and Plaintiffs have advised the Court that they withdraw any claim of relief on account of the claimed unconstitutionality of Sections 1 and 2 of Article 5154f of Vernon's Civil Statutes of the State of Texas (secondary picketing and boycotting)....

[T]his Court makes no adjudication concerning the constitutionality of any of said statutes, either upon its face or as applied.

. . . . .

10. ... As to Section 1 of Article 5154d of Vernon's Civil Statutes of the State of Texas, to the extent quoted below, to-wit,

"Section 1. It shall be unlawful for any person, singly or in concert with others, to engage in picketing or any form of picketing activity that shall constitute mass picketing as herein defined.

" 'Mass picketing,' as that term is used herein, shall mean any form of picketing in which:

"1. There are more than two (2) pickets at any time within either fifty (50) feet of any entrance to the premises being picketed, or within fifty (50) feet of any other picket or pickets."

the Court finds from the evidence adduced upon the trial of this case that Plaintiffs were arrested and incarcerated or threatened with arrest and incarceration or dispersed by Defendants and others acting in concert with them on the sole ground that Plaintiffs and members of their class engaged in picketing or some form of picketing activity in which more than two pickets were located within fifty (50) feet of any other picket or pickets even without the creation or existence of any obstacle to free ingress and egress from any premises and without any obstruction or threat of obstruction or without the existence or threat of physical harm or intimidation in any form. The Court is of the opinion that the application of said portion of Article 5154d to such specific circumstances was and is unconstitutional. Therefore, the Court hereby renders declaratory judgment under [Title] 28 U.S.C. Section 2201 and declares and adjudges that Section 1 of Article 5154d was and is unconstitutionally applied to Plaintiffs and members of their class to the extent that such portion of said statute was or may be applied to them on the sole ground that more than two pickets were located within fifty (50) feet of any other picket or pickets.

Final Judgment as Modified Pursuant to Remand by the Supreme Court of the United States at 3–5, *Medrano v. Allee,* No. 67–B–36 (S.D.Tex., filed June 24, 1976). The Judgment does not make any mention of Art. 5154d, § 1(2), the entrance obstruction prohibition.

In a sense, then, we pick up where *Medrano* left off.

## X. Standing

"Article III of the Constitution imposes limits on the cases federal courts may hear. This includes the requirement, broadly described as the justiciability doctrine, that there be a 'case or controversy.' The very use of the terms 'case or controversy' implies that the dispute must be real, not hypothetical, and that the plaintiff must be personally affected and thus have standing to sue." *KVUE v. Austin Broadcasting Corp.*, 709 F.2d 922, 927 (5th Cir.1983), *aff'd*, — U.S. —, 104 S.Ct. 1580, 80 L.Ed.2d 114 (1984).

"The essence of the standing inquiry is whether the parties seeking to invoke the Court's jurisdiction have 'alleged such a personal stake in the outcome of the controversy as to assure that concrete adverseness which sharpens the presentation of issues upon which the Court so largely depends for illumination of difficult constitutional questions.' " *Duke Power Co. v. Carolina Environmental Study Group*, 438 U.S. 59, 72, 98 S.Ct. 2620, 2630, 57 L.Ed.2d 595 (1978), quoting *Baker v. Carr*, 369 U.S. 186, 204, 82 S.Ct. 691, 703, 7 L.Ed.2d 663 (1962).

■ To establish standing for a challenge to the constitutionality of a state statute, a litigant "must demonstrate a realistic danger of sustaining a direct injury as a result of the statute's operation or enforcement." *Babbitt v. United Farm Workers National Union*, 442 U.S. 289, 298, 99 S.Ct. 2301, 2308, 60 L.Ed.2d 895 (1979).

■ A person who desires to violate a statute that he considers unconstitutional need not disobey the law and await his prosecution before challenging its unconstitutionality. *Steffel v. Thompson*, 415 U.S. 452, 459, 94 S.Ct. 1209, 1215, 39 L.Ed.2d 505 (1974).

"When the plaintiff has alleged an intention to engage in a course of conduct arguably affected with a constitutional interest, but proscribed by statute, and there exists a credible threat of prosecution thereunder, he 'should not be required to await and undergo a criminal prosecution as the sole means of seeking relief.' " *Babbitt*, 442 U.S. at 298, 99 S.Ct. at 2309, quoting *Doe v. Bolton*, 410 U.S. 179, 188, 93 S.Ct. 739, 745, 35 L.Ed.2d 201 (1973).

■ Delia Gamez Prince was a volunteer TFWU organizer working with Moya during the strike. She participated in the initial picketing of the Howard Gault Company field, speaking with workers and handing out leaflets. She also participated in picketing Griffin & Brand. After the TRO issued, her picketing was severely limited. She obeyed the 50-foot spacing rule and used less strident language for fear of violating the TRO's language prohibitions. Because her First Amendment rights were thus infringed, she sustained a direct injury as a result of the Texas picketing statutes' operation and enforcement.

Gamez desires to picket in the future. William Edward Weeks of the Texas Citrus and Vegetable Association, Wesley Fisher of the Barrett-Fisher Co., and David W. Smith of Smith Potato and the High Plains Vegetable Growers and Shippers Council, all testified at trial that they would seek restraining orders under the picketing statutes in the future should similar picketing recur. Their respective organizations were all plaintiffs in the state court suit. The Barrett-Fisher Company signed the TRO bond as a principal.

The Court finds that Gamez has standing to challenge the constitutionality of the statutes in question. Even if, as the growers assert, there has been no picketing since August of 1980, this does not deprive Gamez of standing. As the Supreme Court said in *Medrano*, "[w]e may not assume that because during this period they directed their efforts to the judicial battle, they have abandoned their principal cause. Rather, the very purpose of the suit was to seek protection of the federal court so that the efforts at unionization could be renewed. It is settled that an action for an injunction does not become moot merely because the conduct complained of has terminated, if there is a possibility of recurrence, since otherwise the defendants

'would be free to return to [their] old ways.'" 416 U.S. at 810–11, 94 S.Ct. at 2198.

■ TRLA, on the other hand, presented no evidence at trial that either it or its employees intend to engage in any activity prohibited by the challenged statutes. In fact, TRLA has maintained steadfastly throughout this litigation that the attorneys it employs have never engaged in any form of picketing, but have only advised clients while at the picket lines. Thus there is no threatened injury to TRLA from the operation of the statutes. The trial evidence is unpersuasive that TRLA suffered any actual injury from the operation of the statutes. Instead, any chilling effect on the activities of TRLA's attorneys stemmed from the TRO language which tracked the Legal Services Corporation Act and the regulations promulgated thereunder.

Since neither threatened nor actual injury is present, TRLA fails to satisfy the crucial Article III requirement of injury-in-fact and lacks standing to raise its constitutional challenges to the picketing statutes. *See Secretary of State of Maryland v. Joseph H. Munson Co.,* —— U.S. ——, 104 S.Ct. 2839, 2848, 81 L.Ed.2d 786 (1984); *Singleton v. Wulff,* 428 U.S. 106, 112, 96 S.Ct. 2868, 2873, 49 L.Ed.2d 826 (1976); *Simon v. Eastern Kentucky Welfare Rights Organization,* 426 U.S. 26, 44–45, 96 S.Ct. 1917, 1927, 48 L.Ed.2d 450 (1976).

### XI. The Merits of the Constitutional Challenges

#### A. Art. 5154d, § 1(1)

Article 5154d, § 1(1) provides:

Section 1. It shall be unlawful for any person, singly or in concert with others, to engage in picketing or any form of picketing activity that shall constitute mass picketing as herein defined.

"Mass picketing," as that term is used herein, shall mean any form of picketing in which:

1. There are more than two (2) pickets at any time within fifty (50) feet of any entrance to the premises being picketed, or within fifty (50) feet of any other picket or pickets.

Gamez argues that § 1(1) is unconstitutionally overbroad.

■ A statute is unconstitutionally overbroad if it, as written and as construed by the authoritative state court, reaches a substantial amount of constitutionally protected conduct as well as unprotected conduct. *Broadrick v. Oklahoma,* 413 U.S. 601, 93 S.Ct. 2908, 37 L.Ed.2d 830 (1973). Where a statute imposes a direct restriction on protected First Amendment activity, and where the defect in the statute is that the means chosen to accomplish the state's objectives are too imprecise, so that in all its applications the statute creates an unnecessary risk of chilling free speech, the statute is properly subject to facial attack for overbreadth. *Joseph H. Munson,* 104 S.Ct. at 2853.

The overbreadth doctrine originated in the well-known labor picketing case of *Thornhill v. Alabama,* 310 U.S. 88, 60 S.Ct. 736, 84 L.Ed. 1093 (1940). In that case, the Court concluded that the very existence of some broadly written statutes may have such a deterrent effect on free expression that they should be subject to challenge even by a party whose own conduct may be unprotected. *See Members of the City Council of Los Angeles v. Taxpayers for Vincent,* 466 U.S. 789, 104 S.Ct. 2118, 2125, 80 L.Ed.2d 772 (1984). The *Thornhill* court said:

It is not merely the sporadic abuse of power by the censor but the pervasive threat inherent in its very existence that constitutes the danger to freedom of discussion. One who might have had a license for the asking may therefor call into question the whole scheme of licensing when he is prosecuted for failure to procure it. A like threat is inherent in a penal statute, like that in question here, which does not aim specifically at evils within the allowable area of state control but, on the contrary, sweeps within its ambit other activities that in ordinary circumstances constitute an exercise of freedom of speech or of the press. The

existence of such a statute, which readily lends itself to harsh and discriminatory enforcement by local prosecuting officials, against particular groups deemed to merit their displeasure, results in a continuous and pervasive restraint on all freedom of discussion that might reasonably be regarded as within its purview. 310 U.S. at 97–98, 60 S.Ct. at 742.

■ "[T]he mere fact that one can conceive of some impermissible applications of a statute is not sufficient to render it susceptible to an overbreadth challenge. On the contrary, the requirement of substantial overbreadth stems from the underlying justification for the overbreadth exception itself—the interest in preventing an invalid statute from inhibiting the speech of third parties who are not before the Court.... [T]here must be a realistic danger that the statute itself will significantly compromise recognized First Amendment protections of parties not before the Court for it to be facially challenged on overbreadth grounds." *Taxpayers for Vincent*, 104 S.Ct. at 2126. Where the statute unquestionably attaches sanctions to protected conduct, the likelihood that the statute will deter that conduct is ordinarily sufficiently great to justify an overbreadth attack. *Id.* at 2126 n. 19, *citing Erznoznik v. City of Jacksonville*, 422 U.S. 205, 217, 95 S.Ct. 2268, 2276, 45 L.Ed.2d 125 (1975).

■ The unconstitutional overbreadth of § 1(1) was well analyzed in the district court's opinion in *Medrano*, although this discussion was later rendered dicta by the final disposition of the action. The Court finds § 1(1) unconstitutionally overbroad and adopts as its reasoning the discussion set forth in *Medrano*, 347 F.Supp. at 622–24, beginning with the section titled "(A). Picketing.", and ending with the last full paragraph on page 624 (i.e., ending with: "Little imagination is required to envisage circumstances where groups of demonstrators, substantially larger than two persons, standing at closer quarters than fifty feet would not threaten the safe flow of traffic nor unreasonably interfere with free ingress or egress from nearby buildings.").

The only argument advanced by the State of Texas in support of § 1(1)'s constitutionality is without merit. The State argues:

Without the limiting construction given to the statute in *Medrano* it would be conceded that the statute offends the constitutional principal that "a government purpose to control or prevent activities constitutionally subject to state regulation may not be achieved by means which sweep unnecessarily broadly and thereby invade the area of protected freedom." *Zwickler v. Koota,* 389 U.S. 241 [88 S.Ct. 391, 19 L.Ed.2d 444] (1967). By requiring a prior showing that the picketing has become violent, or that there is evidence of threats of violence, or that the picketing has obstructed or hindered ingress or egress before a number distance formula injunction will lie, the Court in *Medrano* salvaged the constitutionality of § 1(1).

This reasoning is wrong on three counts.

One, the *Medrano* court made no narrowing construction of § 1(1). The original district court judgment declared § 1(1) facially unconstitutional, hence null and void. This finding was vacated by the Supreme Court and withdrawn by the district court after the *Medrano* plaintiffs withdrew their facial challenge to the statute. The final *Medrano* judgment found § 1(1) unconstitutional as applied, but imposed no narrowing construction. Indeed, if the Attorney General's office truly believes that *Medrano* imposed a limiting construction on § 1(1), one must wonder why Gilbert Pena, the Assistant Attorney General who signed the final judgment in *Medrano* on behalf of the State, failed four years later to inform Jerry Smith of this significant limitation on § 1(1) when Pena and Smith were discussing the legal underpinnings of the state court suit which began this litigation.

■ Two, neither the *Medrano* court nor this one has the power to furnish a saving construction for a state statute. While the federal courts have the power to

construe Congressional enactments, they "lack jurisdiction authoritatively to construe state legislation." *United States v. Thirty-seven Photographs*, 402 U.S. 363, 369, 91 S.Ct. 1400, 1405, 28 L.Ed.2d 822 (1971). *See Hill v. City of Houston*, 764 F.2d 1156, 1164 (5th Cir.1985); *Beckerman v. City of Tupelo*, 664 F.2d 502, 509 (5th Cir.1981). The *Medrano* court itself expressly recognized this limitation on its power to supply a narrowing construction. 347 F.Supp. at 625.

Three, even if a narrowing construction could be supplied, the Court "may not, in doing so, rewrite the language or do violence to its plain language." *Long Island Vietnam Moratorium Committee v. Cahn*, 437 F.2d 344, 348 (2d Cir.1970). The language of § 1(1) is plain and straightforward. Picketing in violation of an arbitrary numbers and distance formula is prohibited without reference to the surrounding circumstances. "The clarity and preciseness of the provision in question make it impossible to narrow its indiscriminately cast and overly broad scope without substantial rewriting." *Aptheker v. Secretary of State*, 378 U.S. 500, 515, 84 S.Ct. 1659, 1669, 12 L.Ed.2d 992 (1964).

### B. Art. 5154d, § 1(2)

Article 5154d, § 1(2) gives a second definition of prohibited "mass picketing":

> "Mass picketing," as that term is used herein, shall mean any form of picketing in which:
>
> . . . . .
>
> 2. Pickets constitute or form any character of obstacle to the free ingress to and egress from any entrance to any premises being picketed or to any other premises, either by obstructing said free ingress or egress by their persons or by the placing of vehicles or other physical obstructions.

The *Medrano* court originally found this provision to be unconstitutionally overbroad, but, as noted above, this holding was withdrawn and the *Medrano* court made no final determination of its constitutionality.

In 1981, the Texas Court of Criminal Appeals narrowly construed § 1(2), saying:

> As we construe this statute, in a criminal prosecution for its violation, the State must prove that a person
> (1) Singly, or in concert with others
> (2) intentionally, knowingly or recklessly
> (3) engaged in picketing in which
> (4) pickets constituted or formed any character (type) of obstacle
> (5) which by their person or by the placing of vehicles or any other physical obstructions
> (6) rendered impassable or unreasonably inconvenient or hazardous the free ingress to or egress from any entrance to any premises being picketed or to any other premises.

*Sherman v. State*, 626 S.W.2d 520, 527–28 (Tex.Crim.App.1981) (en banc).

Since the parties agree that § 1(2), as narrowly construed in *Sherman*, does not unconstitutionally infringe upon First Amendment rights, this case presents no challenge to the statute and the Court makes no judgment concerning § 1(2)'s constitutionality.

### C. Art. 5154d, § 2

Article 5154d, § 2 provides:

> It shall be unlawful for any person, singly or in concert with others, by use of insulting, threatening or obscene language, to interfere with, hinder, obstruct, or intimidate, or seek to interfere with, hinder, obstruct, or intimidate, another in the exercise of his lawful right to work, or to enter upon the performance of any lawful vocation, or from freely entering or leaving any premises.

Article 5154d was passed in 1947. Texas has had an analogous criminal statute since 1887. Former Penal Code Article 1146 provided:

> Any person who shall by threatening words or by acts of violence or intimidation prevent or attempt to prevent another from engaging in or from performing the duties of any lawful employment shall be fined not less than twenty-five nor more than five hundred dollars, or be

confined not less than one nor more than six months in jail.

"The statute was enacted as a means of preventing persons from interfering with others who are performing labor or engaging in some lawful business by means of which they [are] earning a support and maintenance...." *Franklin v. State*, 61 Tex.Crim. 235, 134 S.W. 702, 703 (1911). An early survey of state picketing acts found that Texas was the only state to specifically criminalize "threatening words." Hellerstein, *Picketing Legislation and the Courts*, 10 N.C.L.Rev. 158, 168–69 (1932). Although Article 1146 survived until its repeal with the enactment of the new Texas Penal Code, effective January 1, 1974, the paucity of reported cases suggests that it was little used. In part, this reflects the sea change at the turn of the century from the use of the criminal prosecution as the chief legal action against labor to the use of the labor injunction issued by a court of equity. Hellerstein, *supra*, at 161–63. It also reflects the Texas Court of Criminal Appeals' determination that acts which constituted an offense under both Article 1146 and the O'Neill Act of 1941, Former Penal Code Article 1621b ("It shall be unlawful for any person by the use of force or violence, or threat of the use of force or violence, to prevent or attempt to prevent any person from engaging in any lawful vocation within this State"), had to be prosecuted under Article 1621b. *Pittman v. State*, 165 Tex. Cr.R. 569, 310 S.W.2d 103 (1958). None of the decided cases under Article 1146 provide any guidance in construing Article 5154d, § 2.

According to the Table of Dispositions printed in Vernon's Texas Penal Code Annotated, Article 1146 was scattered into three sections of the 1974 Penal Code: § 22.01 (assault), § 22.07 ("terroristic threat"), and § 42.01 (proscribing fighting words or acts in a public place). Article 1621b apparently wound up as the remarkably opaque language of § 42.02(a)(3), the riot statute. Again, the few decided cases do not provide any guidance in construing Article 5154d, § 2. (The spirit of the "threatening words" clause of Article 1146 most clearly survives in the "terroristic threat" statute, § 22.07(a)(3), which provides that "[a] person commits an offense if he threatens to commit any offense involving violence to any person or property with intent to prevent or interrupt the occupation or use of a ... place of employment or occupation." Since it is not a necessary element of the offense that a defendant had the capability or intention to carry out a threat, or, by analogy to the case law construing § 22.07(a)(2), that any occupation or use of a place of employment or occupation was actually prevented or interrupted, *Dues v. State*, 634 S.W.2d 304 (Tex. Crim.App.1982); *Jarrell v. State*, 537 S.W.2d 255 (Tex.Crim.App.1976), application of this statute in the labor picketing context will prove interesting.)

Gamez argues that Article 5154d, § 2 is an unconstitutionally overbroad regulation of pure speech. The State argues that:

Section 2 of the Texas statute focuses on "words coupled with conduct." The Texas Supreme Court authoritatively limited the scope of the section in *Dallas General Drivers, Warehousemen and Helpers v. Wamix, Inc., of Dallas* [156 Tex. 408], 295 S.W.2d 873 (Tex.1956). It is not the words that are actionable, but words that in the context of the situation intimidate or coerce....

[T]he Texas statute " 'as construed, does no more than prohibit the face to face words plainly likely to cause a breach of the peace.' " *Chaplinsky v. New Hampshire*, 315 U.S. 568, 573 [62 S.Ct. 766, 770, 86 L.Ed. 1031] (1942), quoting *State v. Chaplinsky*, 91 N.H. 310, 321, 18 A.2d 754, 762 (1941) .... [A] prior showing of violence or the evidence of the threat of violence must be made before an injunction will lie.

■■ "Fighting words"—those that provoke immediate violence—are not protected by the First Amendment, *Chaplinsky*, 315 U.S. at 572, 62 S.Ct. at 769, but "mere *advocacy* of the use of force or violence does not remove speech from the

protection of the First Amendment." *NAACP v. Claiborne Hardware Co.,* 458 U.S. 886, 102 S.Ct. 3409, 3433, 73 L.Ed.2d 1215 (1982). In *Brandenburg v. Ohio,* 395 U.S. 444, 89 S.Ct. 1827, 23 L.Ed.2d 430 (1969), for example, the Court reversed the conviction of a Ku Klux Klan leader for threatening "revengeance" if the "suppression" of the white race continued. The Court relied on "the principle that the constitutional guarantees of free speech and free press do not permit a State to forbid or proscribe advocacy of the use of force or of law violation except where such advocacy is directed to inciting or producing imminent lawless action and is likely to incite or produce such action." *Id.* at 447, 89 S.Ct. at 1829. Where these conditions are met, the speech may be enjoined. In *Milk Wagon Drivers Union v. Meadowmoor Dairies,* 312 U.S. 287, 61 S.Ct. 552, 85 L.Ed. 836 (1941), for example, the Court affirmed a state court injunction against all picketing in a violence-ridden strike. The Court reaffirmed, however, that a state cannot enjoin peaceful picketing merely because it may provoke violence in others, *id.* at 296, 61 S.Ct. at 556, and emphasized that "the right of free speech cannot be denied by drawing from a trivial rough incident or a moment of animal exuberance the conclusion that otherwise peaceful picketing has the taint of force." *Id.* at 293, 61 S.Ct. at 555.

The "fighting words" exception is, thus, quite narrow. That speech is intended to exercise a coercive impact on its listeners does not remove it from the reach of the First Amendment. *Organization for a Better Austin v. Keefe,* 402 U.S. 415, 419, 91 S.Ct. 1575, 1577, 29 L.Ed.2d 1 (1971). "Speech does not lose its protected character simply because it may embarass others or coerce them into action." *Claiborne Hardware,* 102 S.Ct. at 3424. In *Claiborne Hardware,* the Court found a speech in which a boycott organizer, Charles Evers, said, "If we catch any of you going in any of them racist stores, we're gonna break your damn neck," 102 S.Ct. at 3420, to be constitutionally protected:

The emotionally charged rhetoric of Charles Evers' speeches did not transcend the bounds of protected speech set forth in *Brandenburg.* The lengthy addresses generally contained an impassioned plea for black citizens to unify, to support and respect each other, and to realize the political and economic power available to them. In the course of these pleas, strong language was used.... Strong and effective extemporaneous rhetoric cannot be nicely channeled in purely dulcet phrases. An advocate must be free to stimulate his audience with spontaneous and emotional appeals for unity and action in a common cause. When such appeals do not incite lawless action, they must be regarded as protected speech. *Id.* at 3434.

On its face, § 2 is not limited to the "fighting words" context. It criminalizes precisely the type of speech found constitutionally protected in *Claiborne Hardware, Keefe* and *Brandenburg.* It is not limited to labor picketing, though apparently no Texas case has applied it outside this context. It extends to the spoken, broadcast and written word. It criminalizes both act and attempt. Its overbreadth is breathtaking.

We turn, then, to the State's contention that the Texas Supreme Court's *Wamix* decision authoritatively construed § 2 as being limited to the *Chaplinsky* "fighting words" situation.

In *Wamix,* an employer obtained a temporary injunction against a striking union, which prohibited, among other things, the use of "insulting, threatening, and indecent language toward any Wamix employees, who desire to work, for the purpose of interfering with, hindering and intimidating such employees." 295 S.W.2d at 879. This language plainly is patterned on § 2. The issue before the Texas Supreme Court was whether the evidence supported granting the injunction. It said:

The real question here, then, is this: does the [evidence] justify the conclusion that unless restrained and enjoined therefrom defendants would, in reasonable probabil-

ity, use such insulting, threatening and indecent language toward Wamix employees as was calculated *to intimidate and coerce them not to perform their duties to their employer? Id.* (emphasis added).

The Court answered the question in the negative, because the record disclosed only a single isolated use of the phrase "damned scab," and dissolved that portion of the injunction.

*Wamix* does not in any way limit § 2. The test applied by the Texas Supreme Court—whether the language "was calculated to intimidate and coerce them not to perform their duties to their employer"— does not even remotely resemble the *Brandenburg* test of whether the language "is directed to inciting or producing imminent lawless action and is likely to incite or produce such action." Not performing one's duties to one's employer is not "lawless action" in Texas. *Wamix,* then, reads § 2 to mean what it says and fails to provide the narrowing construction necessary to save it from constitutional infirmity.

The Court finds that § 2 is unconstitutionally overbroad. *See Ex parte Bell,* 19 Cal.2d 488, 122 P.2d 22 (1942) (Traynor, J.) (invalidating similar provisions of a county ordinance on overbreadth grounds).

### D. Art. 5154d, § 3

Article 5154d, § 3 provides:

It shall be unlawful for any person, singly or in concert with others, to engage in picketing or any form of picketing activities, where any part of such picketing is accompanied by slander, libel, or the public display or publication of oral or written misrepresentations.

The State of Texas concedes that § 3 is unconstitutional "to the extent that when the section is applied in tandem with Art. 5154f, § 5, the issuance of an injunction would constitute an unconstitutional prior restraint on otherwise protected speech."

Article 5154f, § 5 provides, in relevant part:

The State of Texas, through its Attorney General or any District or County Attorney, may institute a suit in the District Court to enjoin any person ... from violating any provision of this Act.

It is not immediately obvious that the State may obtain relief under Article 5154f, § 5 for violations of Article 5154d, § 3. Although both articles were enacted by the 1947 Legislature, Article 5154d appears at 1947 Tex.Gen.Laws, ch. 138, at 239, while Article 5154f appears at 1947 Tex.Gen. Laws, ch. 387, at 779. Article 5154d was captioned: "An Act to regulate picketing...." Article 5154f was captioned: "An Act to prohibit secondary strikes...." They appear to be separate acts. For example, the criminal penalty for violation of Article 5154d is a fine of $25–$500 and up to 90 days imprisonment. *Id.* § 5. The equivalent section of Article 5154f imposes a fine of up to $500, with no minimum, and up to 6 months imprisonment. *Id.* § 3. Interestingly, while Article 5154f, § 4 gives a private right of action for damages and injunctive relief for violations of that Act, no similar provision appears in Article 5154d. Be this as it may, Texas courts have never questioned their power to enjoin violations of Article 5154d, including § 3. *See, e.g., Alamo Express v. International Brotherhood of Teamsters,* 215 S.W.2d 936 (Tex.Civ.App.—San Antonio 1948, no writ) (denying injunction based on facts presented). *But see Amalgamated Meat Cutters v. Carl's Meat & Provision Co.,* 475 S.W.2d 300 (Tex.Civ.App.—Beaumont 1971, writ dism'd w.o.j.) (finding that district court had no jurisdiction to issue an injunction preventing the publication of false information by picketers during a strike because such a prior restraint would be in violation of the First Amendment and Article I, § 8 of the Texas Constitution; no mention of Article 5154d, § 3). *Accord Hajek v. Bill Mowbray Motors,* 647 S.W.2d 253 (Tex.1983) (absent threat of danger, Tex. Const. art. I, § 8 prohibits a state court from subjecting speech to the prior restraint of a temporary injunction); *Ex parte Tucker,* 110 Tex. 335, 220 S.W. 75 (1920) (discharging union officer found in

contempt for violating an injunction against "vilifying, abusing, or using opprobrious epithets to or concerning any party or parties in the employment of plaintiff" because injunction violated Tex. Const. art. I, § 8; "Let it once be admitted that courts may arrogate the authority of deciding what the individual may say and may not say, what he may write and may not write, and by an injunction writ require him to adapt the expression of his sentiments to only what some judge may deem fitting and proper, and there may be readily brought about the very condition against which the constitutional guaranty was intended as a permanent protection. Liberty of speech will end where such control of it begins."); *Mitchell v. Grand Lodge Free & Accepted Masons of Texas*, 56 Tex.Civ.App. 306, 121 S.W. 178 (1909, no writ). The TRO issued in this case contained a provision which tracked the language of § 3 verbatim.

Gamez argues that, beyond the prior restraint question conceded by the State, § 3 is unconstitutionally overbroad. She relies primarily on two Supreme Court decisions: *Linn v. United Plant Guard Workers of America*, 383 U.S. 53, 86 S.Ct. 657, 15 L.Ed.2d 582 (1966), and *Old Dominion Branch No. 496, National Association of Letter Carriers v. Austin*, 418 U.S. 264, 94 S.Ct. 2770, 41 L.Ed.2d 745 (1974).

In *Linn*, an assistant general manager of Pinkerton's Detective Agency brought suit under state libel laws against the Plant Guard Workers in a diversity action in federal court. Linn alleged that statements made in a union leaflet during a campaign to organize the company's employees were false and defamatory. The District Court found that the state law action had been pre-empted by § 8(b) of the National Labor Relations Act, 29 U.S.C. § 158(b), and that the National Labor Relations Board had exclusive jurisdiction over the subject matter of the complaint. It dismissed the action and the Court of Appeals affirmed.

In a 5–4 decision, the Supreme Court held that the NLRA did not completely pre-empt the application of state laws to libels published during labor disputes. The Court found, however, that § 8(c) of the NLRA "manifests a congressional intent to encourage free debate on issues dividing labor and management," 383 U.S. at 62, 86 S.Ct. at 663, and adopted the liability standards enunciated in *New York Times Co. v. Sullivan*, 376 U.S. 254, 84 S.Ct. 710, 11 L.Ed.2d 686 (1964), to guard against "unwarranted intrusion upon free discussion envisioned by the Act." 383 U.S. at 65, 86 S.Ct. at 664. Recovery could be had only for defamatory statements published with knowledge of their falsity or with reckless disregard of whether they were true or false. The Court premised its holding entirely on the NLRA, decided no constitutional issues, and emphasized that its adoption of the *New York Times* standard was "by analogy, rather than under constitutional compulsion." *Id.* at 67, 65, 86 S.Ct. at 664.

In *Letter Carriers*, three nonunion employees sued the letter carriers' union in state court for libel after their names were published in an union newsletter under the heading "List of Scabs." The list was accompanied by a disparaging definition of the word "scab." The state trial court interpreted *Linn* to allow recovery where the libel had been published with actual malice, in the sense of evil motive. The Plaintiffs prevailed and the Virginia Supreme Court affirmed.

The Supreme Court reversed. As federal employees, the plaintiffs were covered by Executive Order No. 11491 rather than the NLRA. The basic provisions of the Executive Order establish a labor-management relations system for federal employees which is quite similar to the scheme of the NLRA. The Court reasoned that "application of *Linn* must turn on whether the defamatory publication is made in a context where the policies of the federal labor laws leading to protection for freedom of speech are significantly implicated," and concluded that "any publication made during the course of union organizing efforts, which is arguably relevant to that organizational activity, is entitled to the protection of

*Linn."* 418 U.S. at 279, 94 S.Ct. at 2779. The Court reached this conclusion even though certain language in the NLRA, relied on in *Linn,* was absent from the Executive Order. Because the lower court had not applied the *New York Times* standard adopted in *Linn,* the Court reversed. The Court noted that its holding was based on federal law and did not consider the First Amendment arguments raised by the petitioners. *Id.* at 283 n. 15, 94 S.Ct. at 2781 n. 15.

In a concurring opinion, Justice Douglas stated his belief that the holding should be based on the First Amendment and not simply on federal labor policy. *Id.* at 287, 94 S.Ct. at 2783 (Douglas, J., concurring).

> We said in *Thornhill v. Alabama,* 310 U.S. 88, 102 [60 S.Ct. 736, 744, 84 L.Ed. 1093] (1940), that, "[i]n the circumstances of our times the dissemination of information concerning the factors of a labor dispute must be regarded as within that area of free discussion that is guaranteed by the Constitution." ... I do not think that discussion is free in the constitutional sense when it subjects the speaker to the penalty of libel judgments....
> *Id.* at 288–89, 94 S.Ct. at 2783.

Neither *Linn* nor *Letter Carriers* are applicable here because no federal labor law governs the type of agricultural union organizing Gamez is concerned with. Without any express statutory policies, such as those contained in the NLRA and the Executive Order, Gamez can only rely on her First Amendment arguments. As noted above, neither *Linn* nor *Letter Carriers* reached the First Amendment questions.

Passing on the constitutionality of Article 5154d, § 3 is made somewhat easier because it imposes strict criminal liability. It forbids any oral or written misrepresentation concerning anything, any person, or any matter, without regard to knowledge of the falsity of the misrepresentation or any other standard of fault. In *Smith v. California,* 361 U.S. 147, 80 S.Ct. 215, 4 L.Ed.2d 205 (1959), the Supreme Court held that strict criminal liability cannot be imposed on speech, even if the speech is otherwise constitutionally unprotected. *Smith* involved a bookseller convicted under a municipal ordinance which imposed strict criminal liability for possession of obscene material in a bookstore, regardless of the bookseller's lack of knowledge of the obscene nature of the material. Reversing Smith's conviction, the Court said:

> The appellee and the Court below analogize this strict liability penal ordinance to familiar forms of penal statutes which dispense with any element of knowledge on the part of the person charged, food and drug legislation being a principal example. We find the analogy instructive in our examination of the question before us. The usual rationale for such statutes is that the public interest in the purity of its foods is so great as to warrant the imposition of the highest standard of care on distributors—in fact an absolute standard which will not hear the distributor's plea as to the amount of care he has used. His ignorance of the character of the food is irrelevant. There is no specific constitutional inhibition against making the distributors of food the strictest censors of their merchandise, but the constitutional guarantees of the freedom of speech and of the press stand in the way of imposing a similar requirement on the bookseller. By dispensing with any requirement of knowledge ... the ordinance tends to impose a severe limitation on the public's access to constitutionally protected matter. [The bookseller] will tend to restrict the books he sells to those he has inspected; and thus the State will have imposed a restriction upon the distribution of constitutionally protected as well as obscene literature. *Id.* at 152–53, 80 S.Ct. at 218.

As Justice Frankfurter observed in a concurring opinion, "there is an important difference in the scope of the power of a State to regulate what feeds the belly and what feeds the brain." *Id.* at 162, 80 S.Ct. at 223. *See also New York Times,* 376 U.S. at 278–79, 84 S.Ct. at 724–25. This

principle of no liability without fault was echoed fifteen years later in *Gertz v. Robert Welch, Inc.*, 418 U.S. 323, 94 S.Ct. 2997, 41 L.Ed.2d 789 (1974), where the Court held that states may define their own standards of liability in defamation actions brought by private persons against the news media "so long as they do not impose liability without fault." *Id.* at 347, 94 S.Ct. at 3010. If the institutional media cannot be held civilly liable without fault, then surely largely uneducated and illiterate farm workers cannot be held criminally liable without fault, at least insofar as the speech at issue relates to matters of public concern. *See Dun & Bradstreet v. Greenmoss Builders*, —— U.S. ——, 105 S.Ct. 2939, 86 L.Ed.2d 593 (1985). The labor relations speech on which § 3 most directly impacts has long been recognized as a matter of public concern.

> It is recognized now that satisfactory hours and wages and working conditions in industry and a bargaining position which makes these possible have an importance which is not less than the interests of those in the business or industry concerned. The health of the present generation and of those as yet unborn may depend on these matters, and the practices in a single [field] may have economic repercussions upon a whole region and affect widespread systems of marketing. The merest glance at state and federal legislation on the subject demonstrates the force of the argument that labor relations are not matters of mere local or private concern. Free discussion concerning the conditions in industry and the causes of labor disputes appears to us indispensable to the effect and intelligent use of the processes of popular government to shape the destiny of modern industrial society.

*Thornhill v. Alabama*, 310 U.S. 88, 102–103, 60 S.Ct. 736, 744, 84 L.Ed. 1093 (1940). *See also Thomas v. Collins*, 323 U.S. 516, 65 S.Ct. 315, 89 L.Ed. 430 (1945).

■ By criminalizing any misrepresentation without fault and without regard to whether the speech is on a matter of public concern, § 3 proscribes a significant amount of constitutionally protected speech and is unconstitutionally overbroad. Picketers faced with § 3 must inevitably sharply curtail their comments on a strike, fearful not only of unknowing misrepresentations, but also of being prosecuted for the "loose language or undefined slogans that are part of the conventional give-and-take in our economic and political controversies," and are constitutionally protected. *Cafeteria Employees Union v. Angelos*, 320 U.S. 293, 295, 64 S.Ct. 126, 127, 88 L.Ed. 58 (1943) (suggesting that a state could enjoin "continuing representations unquestionably false").

Because the lack of any standard of fault is fatally defective to § 3, the Court does not reach the issue left open in *Linn* and *Letter Carriers*, namely what standard of fault is compelled by the First Amendment in this context.

Although the preceding analysis has focused most heavily on the libel, slander, and misrepresentation aspects of Article 5154d, § 3, it must be remembered that the core of § 3 is its prohibition on picketing, even peaceful picketing for a lawful purpose, which is accompanied by slander, libel, or misrepresentation. While the State's "strong and legitimate," *Gertz*, 418 U.S. at 348, 94 S.Ct. at 3011, interest in compensating private individuals for injury to their reputation and in deterring future injury allows the imposition of appropriate civil and criminal sanctions for slander and libel, this interest cannot be met with an overly broad statute such as § 3, which outlaws plainly protected speech, e.g., peaceful picketing for a lawful purpose, simply because it is accompanied by unprotected speech.

### E. Art. 5154f

■ Article 5154f, § 1 provides:

It shall be unlawful for any person or persons, or association of persons, or any labor union, incorporated or unincorporated, or the members or agents thereof, acting singly or in concert with others, to establish, call, participate in, aid or abet a secondary strike, or secondary picket-

ing, or a secondary boycott, as those terms are defined herein.

Article 5154f, § 2(b) defines "secondary strike" as:

[A] temporary stoppage of work by the concerted action of two or more employees of an employer where no labor dispute exists between the employer and such employees, and where such temporary stoppage results from a labor dispute to which such two or more employees are not parties.

Article 5154f, § 2(d) defines "secondary picketing" as:

[T]he act of establishing a picket or pickets at or near the premises of any employer where no labor dispute, as that term is defined in this Act, exists between such employer and employees.

Article 5154f, § 2(e) defines a "secondary boycott" as a plan or agreement entered into or any concerted action by two or more persons to cause injury or damage to any person or firm for whom they are not employees. The section then lists the different ways in which this "plan" to "cause injury or damages" may be carried out. Picketing is one of the methods listed. Also, the "aid or abet" clause of § 1 is available to prohibit picketing designed to bring about injury or damage by one of the other five methods listed in § 2(e).

Article 5154f, § 2(h) defines "labor dispute" as:

[A]ny controversy between an employer and the majority of his employees concerning wages, hours or conditions of employment; provided that if any of such employees are members of a labor union, a controversy between such employer and a majority of the employees belonging to such union, concerning wages, hours or conditions of employment, shall be deemed, as to the employee members only of such union, a labor dispute within the meaning of this Act.

Gamez asserts that Art. 5154f unconstitutionally restricts protected picketing rights of unions which do not represent a majority of workers. The State of Texas concedes that Art. 5154f is unconstitutional, but "the unconstitutionality of 5154f is conceded only to the extent that it forbids picketing by less than a majority of a company's employees. The statutory prohibition against secondary picketing and boycotts clearly is constitutional."

The constitutional infirmities of Art. 5154f were explored in *Medrano*, 347 F.Supp. 625–28. As discussed above in Part IX of this Opinion, the *Medrano* court's determination that several sections of Art. 5154f are unconstitutional was vacated by the Supreme Court and no final judgment was ever rendered on the constitutional question.

Less than two years after passage, the Texas Supreme Court found Art. 5154f unconstitutional to the extent that it restricts the meaning of a "labor dispute" to a controversy between an employer and his employees and prohibits picketing except where such a controversy exists. *International Union of Operating Engineers v. Cox*, 148 Tex. 42, 219 S.W.2d 787 (1949); *Construction and General Labor Union v. Stephenson*, 148 Tex. 434, 225 S.W.2d 958 (1950). *See generally,* Williams, *Picketing and Free Speech — A Texas Primer*, 30 Tex.L.Rev. 206, 221–27 (1951). With this keystone gone, several sections of the statute must fall. The Court finds that Art. 5154f, §§ 2(b), 2(d) and 2(e) are unconstitutionally overbroad and adopts the reasoning of the *Medrano* court set forth in the section captioned "ARTICLE 5154f.," at 347 F.Supp. 625–28.

### F. Art. 5154g, § 2

Article 5154g, § 2 prohibits:

[A]ny strike or picketing, an object of which is to urge, compel, force or coerce any employer to recognize or bargain with, or any employee or group of employees to join or select as their representative, any labor union or labor organization which is not in fact the representative of a majority of the employees of an employer or, if the employer operates two or more separate and distinct places of business, is not in fact the representative of a majority of such em-

ployees at the place or places of business subjected to such strike or picketing. The Act provides for civil liability for its violation and allows injunctive relief to be sought by either private litigants or the State. *Id.* §§ 4 and 5.

The last remaining constitutional challenge is to Art. 5154g, § 2. Gamez asserts that it, like Art. 5154f, unconstitutionally restricts protected picketing rights of unions which do not represent a majority of workers. In its Amended Answer, the State admits that Art. 5154g, § 2 "denies plaintiff[s] and others rights secured by the First Amendment in that it prohibits picketing by a union representing less than a majority of the picketed employer's employees," and submits that § 2 was held unconstitutional by the Texas Supreme Court in the *Cox* case.

In the Pretrial Order, the State contends:
[A]rt. 5154g to the extent that it limits a labor dispute to "any controversy between an employer and the majority of his employees" and thereby prohibits picketing by persons who form less than a majority of employees violates the rights of plaintiffs and others which are secured by the First Amendment, and is therefore unconstitutional.

This contention confuses Art. 5154g, which contains no definition of a "labor dispute," with Art. 5154f, which contains the quoted language. The constitutionality of Art. 5154g, § 2 is not addressed in the State's brief. The Plaintiffs' brief treats Arts. 5154f and 5154g, § 2 as functionally equivalent and devotes no separate analysis to Art. 5154g. Both sides apparently misconceive the statute.

Unlike the picketing statutes previously analyzed in this Opinion, Art. 5154g, § 2 is not principally concerned with who may picket and how. Instead, it outlaws *any* picketing whose *objective* is either (1) to compel an employer to recognize or bargain with a minority union, or (2) to compel an employee to join a minority union or select one as his bargaining representative.

Article 5154g was enacted in 1955 (six years *after* the *Cox* decision which the

State suggests held it unconstitutional *sub silentio*), as the culmination of a series of statutes known as the Right-to-Work laws. The O'Daniel Act of 1941, Former Penal Code art. 1621b, made violence in the course of a labor dispute a penal offense. The Manford Act of 1943, Art. 5154a, imposed a variety of regulations on unions operating in the State. The 1947 Legislature passed Acts creating civil liability for picketing in breach of a contract, Art. 5154b; outlawing collective bargaining and strikes by public employees, Art. 5154c; banning mass picketing, Art. 5154d; prohibiting a dues check-off without individual authorization, Art. 5154e; prohibiting secondary strikes, picketing and boycotts, Art. 5154f; outlawing employment discrimination on the basis of membership or non-membership in a labor union, and closed-shop contracts, Art. 5207a; and bringing some union objectives within the ambit of the state antitrust laws, Arts. 5154 and 7428, § 3. The Parkhouse Bill of 1951, Art. 7428–1, placed contracts containing union security clauses under the state antitrust laws. Finally, in 1955, the passage of Art. 5154g outlawed discrimination on the basis of membership or nonmembership in a labor union, a reification of Art. 5207a. *See generally*, J. Dempsey, The Operation of the Right-to-Work Laws 21–22 (1961). "A recall of the tenor of the times (public concern about labor unrest and strikes) when Texas enacted these ... labor restrictive laws, and a review of the laws' contents, mandates the conclusion that the individual's right within labor's ranks was considered by the legislature to be paramount to the rights of a labor organization." *Sayre v. Mullins,* 681 S.W.2d 25, 27 (Tex.1984). The statutes "were designed to curtail labor organization activities in Texas." *Id.* at 26.

Art. 5154g, § 2 outlaws even peaceful picketing on the basis of its objective, an approach which is constitutional in the main. "[P]icketing continues to be constitutionally privileged so long as it is not for an unlawful objective. On the other hand, picketing may constitutionally be outlawed

in those areas where the object of that picketing can constitutionally be outlawed. This is true not only when the purpose of the picketing is to force someone else to be do an unlawful act; it also is true when the objective of the picketing itself is made unlawful." Williams, 30 Tex.L.Rev. at 218. *See Medrano*, 347 F.Supp. at 626–27. The constitutionality of Art. 5154g, § 2 then, would normally turn on whether the prohibited objectives—recognition and bargaining by an employer, joining and selection as bargaining representative by an employee—may constitutionally be outlawed.

The Supreme Court has recognized that states constitutionally may enjoin peaceful picketing whose objective is prohibited by state Right-to-Work provisions such as those contained in Arts. 5154g, § 1 and 5207a. *Local Union No. 10, United Association of Journeymen Plumbers & Steamfitters v. Graham*, 345 U.S. 192, 73 S.Ct. 585, 97 L.Ed. 946 (1953).

The problem with Art. 5154g, § 2 is that it outlaws picketing whose objectives are not otherwise unlawful. That is, it is not unlawful for an employer to recognize or bargain with a minority union, nor is it unlawful for any employee or group of employees to join a minority union or to select one as their representative. Indeed, Article 5152, passed in 1899, provides that "[i]t shall be lawful for any and all persons engaged in any kind of work or labor, manual or mental, or both, to associate themselves together and form trades unions and other organizations for the purpose of protecting themselves in their personal work, personal labor, and personal service in their respective pursuits and employments." In *Flenoy v. Yarbrough*, 318 S.W.2d 15, 16–17 (Tex.Civ.App.—Austin 1958, writ ref'd n.r.e.), decided three years after the enactment of Art. 5154g, the court recognized that the members of a minority union have the right to organize and to bargain with an employer. This being true, Art. 5154g, § 2 prohibits peaceful picketing to attain a lawful objective, a constitutionally impermissible restaint. *See American Federation of Labor v.*

*Swing*, 312 U.S. 321, 61 S.Ct. 568, 85 L.Ed. 855 (1941).

Even if one accepts the proposition that Art. 5154g, § 2 itself outlaws recognition or bargaining with a minority union by an employer, and joining a minority union or selecting one as a bargaining representative, the statute remains unconstitutionally overbroad. The state cannot constitutionally prohibit an employee from joining a minority union because an individual's right to form and join a union is protected by the First Amendment. *Thomas v. Collins*, 323 U.S. 516, 534, 65 S.Ct. 315, 324, 89 L.Ed. 430 (1945); *Orr v. Thorpe*, 427 F.2d 1129, 1131 (5th Cir.1970); *AFSCME v. Woodward*, 406 F.2d 137, 139 (8th Cir. 1969); *McLaughlin v. Tilendis*, 398 F.2d 287, 289 (7th Cir.1968); *Atkins v. City of Charlotte*, 296 F.Supp. 1068, 1077 (W.D.N. C.1969) (3-judge court). As the Supreme Court said in *NAACP v. Alabama*, 357 U.S. 449, 460, 78 S.Ct. 1163, 1171, 2 L.Ed.2d 1488 (1958), "[i]t is beyond debate that freedom to engage in association for the advancement of beliefs and ideas is an inseparable aspect of the 'liberty' assured by the Due Process Clause of the Fourteenth Amendment, which embraces freedom of speech."

Determining whether the state may constitutionally prohibit an employer from recognizing or bargaining with a minority union requires a look at Art. 5154g, § 2 in the context of the Texas Right-to-Work laws and at § 8(b)(7) of the National Labor Relations Act, on which § 2 appears to be patterned in part. The philosophical premise of the Texas Right-to-Work laws is that the right to bargain over wages and working conditions belongs to the individual.

> [I]t is clear that one person has the right to bargain individually and may exercise it even though a majority of his fellow employees, as an individual preference, desire to exercise their right to bargain in a collective manner. The result is to remove the requirement that one who wants to bargain at all must associate himself with a majority that is of like

mind. Under Article 5207a, two, three, a minority or a majority of employees have the right to bargain collectively with their employer, leaving the others who prefer individual bargaining as is their right under the law, to deal on an individual basis. Dempsey, *supra,* at 91.

In contrast, the fundamental premise of the NLRA is that the right to bargain belongs to the certified representative of a majority of the employees. Thus § 8(b)(7) of the Act, 29 U.S.C. § 158(b)(7) (1982), whose constitutionality has been upheld, prohibits picketing "any employer where an object thereof is forcing or requiring an employer to recognize or bargain with a labor organization as the representative of his employees, or forcing or requiring the employees of an employer to accept or select such labor organization as their collective bargaining representative, unless such labor organization is currently certified as the representative of such employees...." Under § 9(a) of the Act, 29 U.S.C. § 159(a), a certified representative is the *exclusive* representative for *all* the employees "for the purposes of collective bargaining in respect to rates of pay, wages, hours of employment, or other conditions of employment."

The unlawful objective on which § 8(b)(7) is based is the goal of a minority union to bargain on behalf of all of the members of a bargaining unit, an objective which may constitutionally be outlawed. Art. 5154g, § 2 outlaws picketing even where the minority union seeks only to represent its own members in a primary dispute over wages and working conditions, an objective which, in the context the Texas laws, may not be constitutionally outlawed. As one commentator has said, "[s]o long as the government is committed to the collective bargaining process, it appears to be impossible to outlaw all picketing, since picketing is an integral part of that process. This follows because it would not be possible to make the objective of the picketing unlawful so long as that objective was limited solely to the process of establishing wages and working conditions in the collective

bargaining tradition." Williams, 30 Tex.L. Rev. at 219.

Finally, Art. 5154g, § 2 also suffers from the same "aid or abet" language contained in Art. 5154f. See *Medrano* at 627.

The court concludes that Art. 5154g, § 2 is unconstitutionally overbroad.

**XII. Summary of Holdings**

1. The Court has jurisdiction under 28 U.S.C. §§ 1331 and 1343(a).

2. The Counter-Defendants in No. 2–80–127, acting under color of state law, deprived Counter-Plaintiff Jesus Moya of his rights under the First Amendment. Moya was not deprived of any other rights secured to him by the Constitution and laws of the United States.

3. The Counter-Defendants in No. 2–80–127 are not entitled to qualified immunity.

4. Counter-Plaintiff Moya is entitled to recover $500 in compensatory damages from the Counter-Defendants in No. 2–80–127.

5. Moya has not adequately pleaded for any recovery against the TRO bond. TRLA is not entitled to any recovery of damages against the TRO bond.

6. In No. 2–80–129, Plaintiff Delia Gamez has standing to raise her constitutional claims. Plaintiff TRLA lacks standing to raise its constitutional claims.

7. The following statutes contained in the Texas Revised Civil Statutes Annotated are unconstitutional, hence null and void:

Article 5154d, § 1(1)
Article 5154d, § 2
Article 5154d, § 3
Article 5154f, § 2(b)
Article 5154f, § 2(d)
Article 5154f, § 2(e)
Article 5154g, § 2

Judgment will be entered accordingly. It is so ORDERED.